**RAMAH NAVAJO SCHOOL BOARD, INC., et al., Appellants,**

**v.**

**Bruce BABBITT, Secretary of the United States Department of the Interior and Ada E. Deer, Assistant Secretary for Indian Affairs, United States Department of the Interior, Appellees.**

**Nos. 95–5334, 95–5348.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 2, 1996.

Decided July 2, 1996.

As Amended Aug. 6, 1996.

Lloyd B. Miller, Anchorage, AK, argued the cause, for appellants, with whom James E. Glaze, Anchorage, AK, Reid P. Chambers, Washington, DC, and Richard A. Poulin, Anchorage, AK, were on the briefs.

Joan M. Pepin, Attorney, United States Department of Justice, argued the cause, for appellees, with whom Lois J. Schiffer, Assistant Attorney General, and Edward J. Shawaker, Attorney, were on the brief.

Before: EDWARDS, Chief Judge, WALD and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge SILBERMAN.

WALD, Circuit Judge:

Plaintiffs Ramah Navajo School Board, Inc. ("Ramah") and the Puyallup Tribe of Indians ("Puyallup") have challenged a plan initiated by the Secretary of the Interior for disbursing fiscal year 1995 contract support funds appropriated by Congress for distribution to Native American Tribes as required by the Indian Self–Determination Act, 25 U.S.C. § 450 *et seq.* ("ISDA" or "Act"). The appellants moved to enjoin the Secretary from distributing the funds in accordance with the new plan, arguing that the allocation would violate the ISDA.

On September 27, 1995, the district court denied Ramah's motion for a preliminary injunction, *Ramah Navajo Sch. Bd., Inc. v. Babbitt,* No. 95cv1770 (D.D.C. Sept. 27, 1995) ("*Ramah*"), Joint Appendix ("J.A.") 12, and two days later it denied a nearly-identical motion filed by Puyallup, *Puyallup Tribe of Indians v. Babbitt,* No. 95cv1848 (Sept. 29, 1995) ("*Puyallup*"), J.A. 21. In ruling against the Tribes, the district court found that the Secretary's allocation decision, which had been published as a Notice in the *Federal Register,* was judicially unreviewable, and that the plaintiffs had therefore failed to demonstrate a likelihood of success on the merits. *Ramah,* at 3–5, J.A. 14–16; *Puyallup,* at 2 (citing *Ramah* ), J.A. 22. We then granted the plaintiffs' emergency motions for an administrative stay to preserve approximately $410,000 in fiscal year 1995 funds which would otherwise have lapsed to the Treasury during pendency of this appeal. *Ramah Navajo Sch. Bd., Inc. v. Babbitt,* No. 95cv1770, Order (Sept. 29, 1995), J.A. 23A; *Puyallup Tribe of Indians v. Babbitt,* No. 95cv1848, Order (Oct. 4, 1995), J.A. 23B.

Because we find that the ISDA provides sufficient law to apply in reviewing the Secretary's actions, and that the Secretary exceeded his authority under the statute, we hold that the district court erred in denying the Tribes' motions for a preliminary injunction.[1] Accordingly, we reverse the orders denying the injunction, and remand to the district court for further proceedings consistent with this opinion.[2]

## I. BACKGROUND

### A. *The Statute*

The ISDA directs the Secretary, upon the request of an Indian Tribe, to turn over to that Tribe the direct operation of its federal Indian Programs. ISDA § 450f (a)(1). Once a Tribe requests control of its programs, the Secretary and the Tribe enter into a "self-determination contract," which the statute specifies must incorporate the provisions of a mandatory "model contract" included in the text of the ISDA. *Id.* § 450l(a), (c). The Act requires the Secretary to provide to the Tribe the amount of funding that would have been appropriated for the federal government to operate the programs if they had not been turned over to the Tribe. *Id.* § 450j–1(a)(1). In addition, the Act requires the Secretary to allocate certain Contract Support Funds ("CSF") to cover the full administrative costs the Tribe will incur—and which, absent the self-determination contract, the federal government would incur—in connection with the operation of these programs. *Id.* § 450j–1(a)(2). This case involves the Secretary's distribution of these CSF, which the statute refers to as an entitlement of the contracting Tribes. *See id.* § 450j–1(g) ("[T]he Secretary shall add to the contract the full amount of funds to which the contractor [the Tribe] *is entitled* under subsection (a)." (emphasis added)).

### 1. *Calculating the CSF*

The amount of CSF due to a particular Tribe for each fiscal year is determined through an annual negotiation process during which the Tribe and the Office of the Inspector General ("OIG") of the Department of the Interior determine the total amount of funding the Tribe will receive for the year (the Tribe's base funding) and the size of the contract support pool needed to support that base (the support pool). The ratio of the support pool to the total base provides the "indirect cost rate," which dictates the amount of CSF the Tribe is entitled to receive for the year from each funding agency that contributes to the program base.[3] In a year in which Congress appropriates sufficient money to cover the Secretary's CSF obligations, each Tribe is entitled to receive the full amount of its CSF funding.

### 2. *Availability of Funds*

Although Congress drafted the CSF funding provisions in mandatory terms ("There *shall* be added ... contract support costs which *shall* consist of ... [and] *shall* include ..." ISDA § 450j–1(a)(2), (3) (emphasis add-

1. The district court expressly found that the plaintiff Tribes had met their burden on the remaining three elements of a preliminary injunction claim. The court accepted that (1) plaintiffs would suffer irreparable harm if the injunction were not granted; (2) other interested parties would not suffer substantial harm if the injunction were granted; and (3) the public interest would be furthered by the injunction. *See Ramah* at 2–3 & n. 1; *Puyallup* at 2. Thus, our reversal on the fourth element—likelihood of success on the merits—establishes as a matter of law that the preliminary injunction should have been granted.

2. The district court, in its discretion, might choose to hold a hearing, at which the plaintiff Tribes and the Secretary could address the precise distribution of the escrowed funds. As we note in our discussion of Rule 19, *infra* at 1350–

1351, even if the Secretary during any given year initially has some limited discretion to allocate a CSF shortfall among the Tribes, that discretion is further bound in this particular case by the fact that Ramah and Pullayup, at this point, are the only Tribes with a legal claim to the small amount of 1995 funds still remaining.

3. By way of example, if a Tribe and the OIG determined that the Tribe would receive total funding of $1 million from the Interior Department and other state and federal agencies (base funding), and that the administrative costs for the programs would be $200,000, then the Tribe would have an indirect cost rate of 20% ($200,000/$1 million). If $800,000 of the base program funding came from the Interior Department, the Tribe would be entitled to receive $160,000 (20% × $800,000) from the Secretary in CSF.

ed)), and forbade the Secretary to reduce the amount of funding for virtually any reason except a reduction in appropriations or tribal authorization, *see id.* § 450j–1(b)(2), the Act also contains a proviso that reads:

> Notwithstanding any other provision in [the Act], the provision of funds under [the Act] is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under [the ISDA].

*Id.* § 450j–1(b). It is this last provision that formed the basis for the district court's determination that the Secretary's allocation decisions, in the event of an appropriations shortfall, were committed to agency discretion and not subject to judicial review.

## B. *The 1995 Appropriations Shortfall and the Secretary's New Policy*

In 1995, the Bureau of Indian Affairs ("BIA") identified a projected need of $105 million for the year to fund contract support needs for all eligible Tribes. In the Appropriations Act of 1995, however, Congress directed that the Secretary was *not to exceed* $95,639,978 for this purpose, thus creating the funding shortfall. Interior Appropriations Act of 1995, Pub.L. No. 103–332 (Title I), 108 Stat. 2499, 2511 (Sept. 30, 1994) ("1995 Act") (Appellants' Addendum ("A.A.") 43).

Faced with the congressional cap on CSF appropriations, and therefore unable to provide all of the Tribes with their full CSF entitlement, the Secretary published a Notice in the *Federal Register* in November, 1994, announcing a new BIA policy for fund allocation. The announcement stated that any Tribe failing to submit a proposal for its 1995 indirect cost rate (the rate at which its program base should be funded for overhead costs) by June 30, 1995, would not be eligible for full funding. Rather, the Tribe would be "eligible for 50 percent of the required contract support," based on its 1994, rather than 1995, rate.[4] Any Tribe which submitted its proposal on time (by June 30) would receive full funding if, once the CSF had been reduced for all of the late Tribes, the appropriation proved sufficient to cover the full cost of the others. If the appropriation still proved insufficient, the money owed to the Tribes which filed timely proposals would be subject to a *pro rata* reduction. *Distribution of Fiscal Year 1995 Contract Support Funds,* 59 Fed.Reg. 55,318 (Nov. 4, 1994) ("Notice"), A.A. 1.

Ramah and Puyallup, along with forty-four other tribal contractors, missed the June 30 deadline and had their CSF reduced by 50% according to the Secretary's 1995 plan. The parties apparently agree that Ramah's 1995 base amount for BIA contracts eligible for CSF is $1,634,001, and Puyallup's base amount is $1,001,872. Brief for Appellants at 9, 11. In August, a month and a half after the deadline established by the Notice, Ramah submitted a proposal for a 1995 indirect cost rate of 25.1%, which would have translated into $410,134 in CSF (the contract base multiplied by the indirect cost rate). *See* Supp. Decl. of Daisy West, Indian Self–Determination Analyst for the BIA at 1–2 (Sept. 18, 1995), J.A. 80–81. Puyallup has yet to submit a 1995 indirect cost rate proposal,[5] but anticipates that its rate will be substan-

---

4. The Notice also contained a statement in reference to the Tribes failing to submit proposals by June 30 that "Additional CSF shall not be provided until such time as a current proposal is received by the Inspector General." 59 Fed.Reg. 55,318.

Although the final sentence of the Notice arguably implies that additional funds *will* be made available once the Tribe submits a 1995 proposal, the Secretary apparently has not honored that particular provision of the Notice. Although we decide this case on other grounds, we note that, even if the policy itself were found to be justified, the Notice might well have been insufficient adequately to warn the Tribes of its full scope and consequences.

5. At oral argument, counsel for the Tribes explained that internal rules of the OIG require a Tribe to include with its proposal an audit from the last concluded year. Tr. of Oral Argument at 50 (Feb. 2, 1996) (citing OMB Circular A–120–87). As explained at oral argument and in the record, Puyallup had been unable to submit its 1995 proposal by June 30 because it had not yet received its final 1993 audit from the accounting firm conducting that audit. *See* Aff. of Terry Westover, Director of Business Office for Puyallup Tribe at 3 (Sept. 26, 1995), J.A. 84; Supp. Aff. of Terry Westover at 2 (Sept. 28, 1995), J.A. 87.

tially the same as its 1994 rate of 35.9%, which would translate into $359,672 in CSF. *See* Aff. of Terry Westover at 2 (Sept. 26, 1995), J.A. 83.

In accordance with the new policy, however, the Secretary used Ramah's 1994 rate of 20.3% and ruled that the Tribe was eligible only for half of the funds based on that rate. The Secretary thus determined that Ramah was eligible for only $165,851 (the 1994 rate, multiplied by the base amount, and then reduced by 50%). Likewise for Puyallup, the Secretary reduced by 50% the amount to which the 1994 rate would have entitled the Tribe when multiplied by the 1995 contract base. Thus, the Secretary awarded Puyallup $179,836 instead of the $359,672 the Tribe believes it deserved.

Even after the forty-six tardy Tribes were penalized according to the formula established in the Notice, the congressional CSF allocation proved insufficient to meet the full needs of the remaining Tribes. As called for in the Notice, the Secretary then allocated the remaining CSF, at a prorated rate of 91.7413% of their statutory entitlement, to those Tribes which *had* complied with the deadline. Thus each fully-compliant Tribe received approximately 92% of the amount that resulted from multiplying its 1995 indirect cost rate by its 1995 contract base, while each late Tribe received 50% of an amount calculated by multiplying its 1994 rate by its 1995 base.

The appellants claim that the 1995 allocation decision is subject to judicial review and that the Secretary exceeded his statutory authority when he announced the new requirement Tribes had to meet because of the appropriations shortfall. In response to these claims, the Secretary alleges that Congress committed this particular decision to agency discretion and thereby rendered it unreviewable by the courts. On the merits, the Secretary claims that the distribution formula outlined in the Notice constituted a "general statement of policy" and thus avoided the Act's prohibition against the promulgation of "regulation[s]" or "nonregulatory requirement[s]." Finally, the Secretary argues that the district court erred in failing to dismiss this case, *sua sponte,* under Rule 19

of the Federal Rules of Civil Procedure, *see infra* note 8, because the nonparty Tribes who would have received the now-enjoined funds under the 1995 Notice policy are necessary and indispensable parties to this dispute. We reject the Secretary's position and find for the appellant Tribes.

## II. DISCUSSION

### A. *Reviewability*

The district court, relying on the Supreme Court's decision in *Lincoln v. Vigil,* 508 U.S. 182, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993), held that the allocation of insufficient appropriations in this case was committed by law to agency discretion and thus was not judicially reviewable. Therefore the court determined that the plaintiff Tribes had failed to demonstrate a likelihood of success on the merits of their claim and denied the preliminary injunction the Tribes had sought. *Ramah* at 3–4, J.A. 14–15; *Puyallup* at 2, J.A. 22.

■ As the district court recognized, the Administrative Procedure Act, 5 U.S.C. § 553 *et seq.* ("APA"), establishes a strong presumption in favor of reviewability of agency action. *Ramah* at 3 (citing 5 U.S.C. § 702; *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) ("*Abbott Labs*")), J.A. 14. The APA makes an exception, however, for agency action which has been "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). In the "rare circumstance" in which a statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," the court will presume that Congress intended to preclude review. *Lincoln,* 508 U.S. at 189–93, 113 S.Ct. at 2030–31.

■ The key to any determination of reviewability is congressional intent. This court has recently affirmed that "we begin with the strong presumption that Congress intends judicial review of administrative action," *Dickson v. Sec'y of Defense,* 68 F.3d 1396, 1401 (D.C.Cir.1995) (citing *Bowen v. Michigan Acad. of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90

L.Ed.2d 623 (1986)) (internal quotations omitted), and that the court will not deny review "unless there is persuasive reason to believe that such was the purpose of Congress." *Id.* (citing *Abbott Labs,* 387 U.S. at 140, 87 S.Ct. at 1511). Of course, one way Congress can express its intent to commit a decision to the discretion of an agency official is to delegate authority in such broad terms that the statute provides "no law to apply," *see Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971), or "no meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

■ We do not think that there is any support in the text or history of the ISDA, or in prior caselaw, for the district court's conclusion that the ISDA committed the allocation of insufficient CSF to the Secretary's discretion. Congress has clearly expressed in the ISDA both its intent to circumscribe as tightly as possible the discretion of the Secretary, *see* ISDA § 450k(a) (prohibiting the Secretary from promulgating any regulation or imposing any nonregulatory requirement, except for regulations pertaining to sixteen carefully delineated topics not relevant here), and its intent to make available judicial review of all agency action, *see id.* § 450m–1(a). The statute itself reveals that not only did Congress *not* intend to commit allocation decisions to agency discretion, it intended quite the opposite; Congress left the Secretary with as little discretion as feasible in the allocation of CSF.

### 1. *The Text and Structure of the ISDA*

Section 450m–1(a) of the ISDA expressly declares that United States district courts shall have original jurisdiction over "*any* civil action or claim against the appropriate Secretary *arising under [the Act]*." ISDA § 450m–1(a) (emphasis added). This provision does not contain any exception for allocation decisions made pursuant to insufficient congressional appropriations, and it is not this court's prerogative to read such an exception into the statute.

Although the language of the statute's announcement of the availability of judicial review is perfectly clear and thus needs no illumination from the legislative history, the 1987 Senate Report accompanying the 1988 Amendment which added the judicial review provision leaves no doubt that Congress intended exactly what it wrote:

> The amendments made by [§ 450m–1(a)] are necessary to give self-determination contractors [Tribes] *viable remedies* for compelling BIA and IHS compliance with the [ISDA]. The strong remedies provided in these amendments are required because of *those agencies' consistent failures over the past decade* to administer self-determination contracts in conformity with the law. Self-determination contractors' rights under the Act have been systematically violated *particularly in the area of funding indirect costs.*

. . . . .

> [T]he Bureau of Indian Affiars [sic] has also taken to arguing that such contractors have *no legal remedies at all* by which to redress the Bureau's failure to fund their contracts with indirect costs at the level mandated by law and by their contract terms.

S.Rep. No. 274, 100th Cong., 1st Sess. 37 (1987), *reprinted in* 1988 U.S.C.C.A.N. at 2620, 2656 (emphasis added), A.A. 23.[6]

---

6. The dissent implies that jurisdiction and reviewability are unrelated, and that our reliance on § 450m–1(a) confuses the two. Dissent at 1. Of course it is true that a statutory grant of jurisdiction cannot overcome a constitutional bar to judicial review (such as standing or mootness), but it seems quite a stretch to conclude from this that a statutory grant of jurisdiction is *irrelevant* on the question of congressional intent to provide judicial review. If Congress intended to make a certain kind of claim unreviewable, as the dissent suggests it intended in the case of insufficient

appropriations, it would certainly make no sense to provide jurisdiction in a particular court over that unreviewable claim. Rather, one might have expected Congress to signal such an exception instead of describing jurisdiction in the unequivocally broad terms it used here. This is true particularly in a context where Congress amended the ISDA to provide legal remedies against the BIA specifically in the area of funding indirect costs. The ISDA gives the district court jurisdiction over "any civil action ... arising under the Act," not over "any civil action arising

Despite clear congressional irritation both with the agencies' "failures to administer self-determination contracts in conformity with the law" and with their arguments that the Tribes have no legal remedies for the agencies' failure to comply with the Act, the Secretary now makes a rather audacious claim: according to the Secretary, when Congress wrote into the ISDA that the provision of CSF "is subject to the availability of appropriations," it intended that any time Congress underfunds the CSF allotment by even a small amount, the agency (one of the agencies that had been "systematically violat[ing]" the Tribes' rights in the area of indirect costs) has virtually unfettered (and unreviewable) authority to allocate those funds in any way the Secretary sees fit.[7] In essence, the Secretary argues—and the dissent accepts—that the "subject to the availability of appropriations" proviso[8] reflects congressional intent to create a bifurcated statutory scheme: in years of bounty, Congress intended to bind the Secretary to a strict and detailed funding formula; in years of insufficient funding, however, Congress invited the Secretary to ignore any and all substantive provisions of the Act and to distribute the appropriated CSF with nearly limitless discretion.[9]

The real purpose of the proviso is quite different when read in context of the entire Act. Given the mandatory terms of the Tribes' CSF entitlement under the Act, Congress clearly included the proviso not to excuse the Secretary's obligation to follow the mandates of the statute, but rather to make evident that the Secretary is not required to distribute money if Congress does not allocate that money to him under the Act. The first part of the provision says just that: "Notwithstanding any other provision in this subchapter, the provision of funds under the subchapter is subject to the availability of appropriations." Thus, if the money is not available, it need not be provided, despite a Tribe's claim that the ISDA "entitles" it to the funds.

The second part of the provision ("and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter") simply expands on the disclaimer of the first part. Even though the ISDA speaks of a Tribe's "entitlement" to certain funds, the Secretary cannot be forced to take money from a program serving a Tribe (for example, from one of the federally-funded "programs" for which CSF is to cover administrative costs) in order to make up for a CSF appropriations shortfall.

Thus, we read the subject-to-availability-of-funds provision to mean precisely what it says: the Secretary need only distribute the amount of money appropriated by Congress under the Act, and need not take money intended to serve non-CSF purposes under the ISDA in order to meet his responsibility to allocate CSF.

The dissent writes of a "zero sum game" in which the Secretary must "reduce" one

---

under the Act in a year during which Congress appropriated full funding." We will not, without more, assume that Congress intended for that jurisdiction to be meaningless.

7. The Secretary goes so far as to suggest that he is doing the Tribes a *favor* by permitting them to receive even half of their funds, since, in his discretion, he could have set a deadline and penalized late Tribes by cutting off their CSF entirely. *See* Brief for Appellee at 7 ("To mitigate the hardship to those tribes that failed to submit a FY 1995 indirect cost rate proposal by June 30, 1995, however, the agency provided that those tribes could receive 50% of their contract support funds, calculated using their FY 1994 indirect cost rate.").

8. The provision reads:

Notwithstanding any other provision in [the Act], the provision of funds under [the Act] is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under [the Act].
ISDA § 450j–1(b).

9. The dissent suggests that the threat of Presidential or congressional disapproval will ensure that the Secretary exercises his unreviewable discretion in a reasonable manner. *Dissent at 1353.* Apparently Congress disagrees. Precisely *because* the Secretary had consistently failed to behave in a reasonable manner (despite the risk of "outraged reactions to such a misuse of discretion," *id.*), Congress elected specifically to cabin the Secretary's discretion under the Act.

Tribe's CSF funding in order to "increase" another Tribe's funding. Dissent at 1354. Because the statute says the Secretary is not required to reduce funding for programs serving a Tribe to make funds available to another Tribe, the dissent argues that the allocation of a CSF shortfall must fall within the Secretary's discretion. But our interpretation of the proviso does not require the Secretary to take anything from one Tribe to give to another; from the start, each Tribe had a right only to the amount of CSF it would have received under a legal allocation plan.[10]

Perhaps an analogy helps. Suppose a school regulation states that the principal must distribute one textbook per course to each student enrolled in the school, but also states that the provision of books under this regulation is "subject to the availability of supplies." Furthermore, the regulation

notes that the principal is not required to take books from one student to make them available to other students. The dissent would argue that the "plain meaning" of the provision requires that, in any semester during which the school board's allocation falls one book short, the principal, in her discretion, may give all 1000 textbooks to her twenty top students without running afoul of the regulation. Our view, on the other hand, is that this regulation requires the principal to follow the general formula of the regulation (one book per student per course) as closely as possible, given the restraint of the shortfall. The subject-to-availability language means that the principal need not go to the Salvation Army in search of extra books, and the last sentence means that she need not require the son of a math teacher to bring his extra math books from home to meet the needs of his classmates.[11]

10. The dissent calls this argument "circular," because the Secretary "is not legally obliged to divert *any* funding *under the subchapter* [the Act], which includes both CSF and contract funds, for any purpose away from one or more tribes to give to another." Dissent at 1354. But ISDA § 450j-1(b) is intended to instruct the Secretary on how to allocate the funds *at the time he receives an appropriation from Congress.* By characterizing the majority position in this case as "taking" funds from one Tribe to give to another, and by treating "1995 requested funding" as money already belonging to a Tribe, *id.,* the dissent turns to the provision at some date *after* the Secretary has already made his arguably illegal allocation, and then concludes that the Act does not require him to fix that mistake. We do not find this to be a credible reading of the provision.

Next, we note that under the dissent's interpretation of the provision, the Secretary could presumably have pledged the full 1995 appropriation to the first few Tribes to apply for it (despite the threat of Presidential or congressional disapproval), and left the overlooked Tribes with no legal remedy under the Act. In fact, if the "subject to the availability of appropriations" language "wipes out" the rest of the statute, Dissent at 1355, and turns an allotment of funds into a lump-sum appropriation in years of insufficient funding, why could not the Secretary, in his discretion, determine that the money should be used primarily for *non-CSF* purposes under the ISDA (for example, for a school system authorized under § 458 of the Act to receive federal funding)? The Appropriations Act of 1995 appropriated $1.5 billion "of which *not to exceed* $95,823,000 shall be for [CSF]," *supra* at 1354 (emphasis added), and did not order the Secretary to make any specific minimum amount CSF

payments. It seems to us that under the dissent's approach to this case, a distribution of $1 in CSF would be unreviewable, and we find little comfort in the dissent's somewhat ironic assurance that we might find review under the 1995 Act because we know that Congress appropriated the money "in response to [the Secretary's] request for CSF."

11. The dissent assumes, Dissent at 1354–1355, that under our reasoning the principal would violate the regulation if she handed out books (one per student per course) on the first day of class, and required those who missed the first day of school to share the leftover books. It is not at all clear that this scenario *would* violate the regulation, as long as every student had access to a book for every class; the question would be whether the principal's allocation plan honored the mandate of the original regulation as much as possible, given the constraint of the shortfall.

We are not troubled by the fact that the Secretary could not implement precisely the same solution as our hypothetical principal (after all, two people sharing a book can each take full advantage of the benefits of that book, whereas two Tribes "sharing" funds most certainly cannot both take full advantage of those funds); different facts will lead to different solutions, but not to a different rule. The rule we state in this opinion is *not,* as the dissent alleges, that the Secretary must necessarily follow some precise ratio established in the ISDA; rather, we hold that an insufficient appropriation fails to excuse an agency from its obligation to follow as closely as possible the allocation plan Congress designed in anticipation of full funding. *Infra* at 1347– 1349. We expressly leave open the possibility

We believe the language of the Act, including the proviso in § 450j–1(b), clearly supports our interpretation as the most reasonable one. We therefore disagree with the district court's conclusion that the Supreme Court's decision in *Lincoln v. Vigil, supra,* 508 U.S. 182, 113 S.Ct. 2024, 124 L.Ed.2d 101, governs this case. In *Lincoln,* the Supreme Court discerned, from the structure of the statutes involved there, a congressional intent to grant unfettered discretion to the agency in its allocation of certain funds. The first statute at issue in *Lincoln,* the Snyder Act, granted the Indian Health Service ("IHS" or "Service") of the Department of Health and Human Services the broad authority "to expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians." 508 U.S. at 185, 113 S.Ct. at 2027. The other statute, the Indian Health Care Improvement Act, authorized expenditures for "therapeutic and residential treatment centers." *Id.* at 185, 113 S.Ct. at 2028. Neither these statutes nor the subsequent lump-sum appropriation contained any reference to individual Indian programs, but the IHS had for years funded the Indian Children's Program out of the Service's annual lump-sum allotment.

In 1985, however, the IHS decided to terminate the Indian Children's Program and allocate those resources toward a national children's program instead. The Court concluded that the statute had delegated unreviewable authority to the Secretary to reallocate the money included in the lump sum, since "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192, 113 S.Ct. at 2031. After noting the strong presumption in favor of judicial reviewability, the Court nevertheless concluded that

> [W]here Congress merely appropriates lump-sum amounts *without statutorily restricting what can be done with those funds,* a clear inference arises that it does not intend to impose legally binding

restrictions.... Put another way, a lump-sum appropriation reflects a congressional recognition that an agency must be allowed flexibility.

*Id.* at 192–93, 113 S.Ct. at 2031–32 (citations and internal quotations omitted) (emphasis added). Because the statute itself mentioned no restrictions on the agency's allocation decisions, and thus offered no meaningful standard against which to judge the agency's discretion, the Court refused to rely on references in the legislative history referring to the children's program to conclude that Congress intended to mandate the continued funding of that particular program. The Court noted that a statute which does not direct any particular method of allocation demonstrates congressional intent to recognize that the agency's decisions depend on "a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* at 193, 113 S.Ct. at 2032.

Despite its ultimate conclusion, the Court warned that "[o]f course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes (though not, as we have seen, just in the legislative history)." *Id.*

The situation here is in marked contrast to that in *Lincoln*; there is overwhelming evidence that Congress intended the ISDA to limit the Secretary's discretion in funding matters and to provide for judicial review of all of the Secretary's actions. The remaining challenge, then, is to identify the "meaningful law to apply" to our review of the Secretary's allocation of insufficient funds.

### 2. *Meaningful Law to Apply*

Our decision in *City of Los Angeles v. Adams,* 556 F.2d 40 (D.C.Cir.1977) ("*Adams*") provides the necessary guidance in locating the "law to apply" in this case. We held there that "[w]hen Congress modifies a statute by an appropriations measure ... the agency administering the statute is

---

that the Secretary might come up with an alternative to *pro rata* distribution of the shortfall, so long as he remains within the boundaries of the

limited discretion delegated to him by the Act. *See id.*

required to effectuate the original statutory scheme as much as possible, within the limits of the added constraint." *Id.* at 50.

In *Adams*, the Airport and Airway Development Act had committed certain minimum funds to Los Angeles and other cities for airport improvements, but a later insufficient appropriation made full funding of all these projects impossible; as a result, the agency cancelled Los Angeles' grant. The Federal Aviation Administration ("FAA"), like the BIA here, used the appropriation shortfall "as a hinge for enlarging its discretion to decide which projects to fund." *Id.* at 43. We rejected the FAA's no-limits approach, however, holding that the agency "went too far" when it used the shortfall "as a basis for asserting a new discretion ... that flew in the face of Congress' unambiguous and uncontradicted demarcation of that discretion," *id.* at 50, and we mandated that the agency give effect—within the limits of the money available—to the allocation formula provided in the statute. *Id.* at 43.

■ Puzzlingly, the Secretary claims that *Adams* supports his position rather than the Tribes', because, according to him, *Adams* "turned on" the court's finding that "the statute provided guidance on how to appropriate the insufficient funds." Brief for Appellees at 24. However, in *Adams*, as here, the original statute itself contained no express mention of how to allocate insufficient funds; rather, the *Adams* court found the guidance needed from the statute's description of how Congress intended the agency to allocate *full* funding. The same kind of guidance is found in the ISDA; the Act informs the Secretary exactly how the full funding should be allocated, and that method pro-

vides a meaningful standard by which to review the Secretary's dissemination of the *insufficient* funds as well. Although the Secretary attempts to distinguish *Adams* on the basis of the Airport and Airway Development Act's provision of a "*ratio* directing how the funds should be distributed," *id.* (emphasis added), we are at a loss to understand why a statutory *ratio* is inherently more compelling than any other clear statutory funding formula.[12] The critical message of *Adams* cannot be that ratios have some magical power to survive a funding deficiency, but rather that an insufficient appropriation fails to excuse an agency from its obligation to follow as closely as possible the allocation plan Congress designed in anticipation of *full* funding. In this case, *Adams'* mandate to "preserve the allocation formula provided by [the statute]," *Adams*, 556 F.2d at 50, militates toward the imposition of a *pro rata* reduction among all the eligible Tribes based on their most recent indirect cost ratio filings.

Any discretion in the Secretary to propose an alternative distribution plan which, like a *pro rata* reduction, would honor the CSF provisions in the ISDA is further restrained by language in the Act which specifically prohibits the Secretary from "promulgat[ing] *any* regulation" or "impos[ing] *any* nonregulatory requirement," except with respect to certain enumerated topics. Thus, when the Secretary distributes the shortfall, he must do so without imposing any new nonregulatory requirement on the Tribes. Any rule that smacks of punishment, as does the 50% penalty the Secretary imposed on these Tribes for not filing their 1995 rates by June 30, clearly violates this statutory limitation.[13]

Not only would a *pro rata* reduction easily "effectuate the original statutory scheme" of

---

12. Of course, in any given year, a Tribe's entitlement *can* be stated as a ratio. For example, if full funding in 1997 would require a $100 million dollar appropriation, and Tribe X's full entitlement for that year would be $1 million, Tribe X's full entitlement would be 1/100th of the total appropriation. Thus, if the Secretary had opted for *pro rata* funding according to this discernible ratio, *Adams* would have supported his decision. However, since we read *Adams* as standing for the broader proposition that an agency must allocate a shortfall in accordance with the substantive standard set out in anticipation of full funding, the Secretary could in any given year

propose an alternative plan that would also respect the substantive mandates of the ISDA.

13. The Secretary attempts to avoid this result by claiming that the 50% rule "does not require anything from the Tribes ... and does not impose any requirements *or penalties.*" This argument would be more compelling if, for example, the Secretary had merely utilized the previous years' on-file CSF ratio for the Tribes that failed to submit new proposals. The imposition of a 50% penalty for tardiness, however, can hardly be considered nonpunitive.

the ISDA, but such a plan would also comply with congressional intent behind the 1995 Appropriations Act. The legislative history of the 1995 Act indicates that Congress, aware that it had appropriated an insufficient amount for full CSF funding, intended for the agency to deal with the shortfall through a *pro rata* reduction. The statement of the managers accompanying the conference report on the 1995 Act states that "[r]eport language and allocations set forth in either [the House Report or the Senate Report] which are not changed by the conference are approved by the committee of conference." H.R. CONF. REP. No. 740, 103d Cong., 2d Sess. 13 (1994), A.A. 51. Both the House and Senate Reports had directed a *pro rata* reduction. H.R.REP. No. 551, 103d Cong., 2d Sess. 56 (1994) ("[S]hould this amount prove insufficient, the procedures should ensure that each [Tribe] receives a proportionate share of their fiscal year 1995 contract support costs."), A.A. 46; S.REP. No. 294, 103d Cong., 2d Sess. 57 (1994) (The agency "should ensure that contract support funding is allocated in such a way that all tribes will be treated the same if there is a shortfall in contract support funds by the end of the year."). A.A. 48.

The Secretary admits that the impact of the legislative history is that the 1995 Congress intended a *pro rata* reduction, *see* Brief for Appellees at 15, but claims that such history is irrelevant because the Appropriations Act itself is silent on the matter of how to distribute the shortfall, and legislative history with "no statutory reference point" is meaningless as authority. *Id.* at 16 (citing *International Brotherhood of Elec. Workers v. NLRB*, 814 F.2d 697, 712 (D.C.Cir.1987)). We agree that the 1995 legislative history does not provide "law to apply" insofar as the *pro rata* reduction is concerned, but this in no way detracts from its usefulness as strong evidence that Congress in 1995 continued to assume that CSF would be distributed according to the allocation formulas originally set out in the ISDA. It thus verifies our conclusion that the original Act provides the necessary guidance for allocation of insufficient funding.

Thus it is clear that the Congress responsible for the ISDA did *not* intend, in the case of insufficient funding, for the numerous detailed provisions of the Act to be shunted aside by a Secretary exercising total discretion in allocation of the funds. Nor, as the legislative history shows, did the 1995 Congress which appropriated the insufficient funds intend for its shortfall to eviscerate the substantive provisions of the earlier Act. The Secretary's reading of the ISDA would beget an incoherent result: in a year in which Congress appropriated 100% of the funding needed for CSF, the Secretary would have only the extremely limited authority, subject to judicial review, to promulgate regulations on specified topics in accordance with stringent notice and comment procedures, *see* ISDA § 450k(c); *however*, in a year in which Congress appropriated 99%, instead of 100%, of the necessary funds, the Secretary would be able to exercise almost absolute discretion in allocation of those funds, with no concern about judicial oversight. The text of the Act demonstrates that Congress never intended to commit the allocation of CSF, full or partial, to agency discretion, and that the Secretary in this case exceeded the limited scope of his authority in promulgating the new allocation rules.[14]

### B. *The Statutory Violation*

■ Unless the "subject to the availability of appropriations" language of § 450j–1(b)

---

14. The Tribes suggest that we also look to ISDA § 450j–1(b) for the law to apply in our review. This section states that the Secretary may only reduce the Tribes' funding for one of a number of specified reasons, including "pursuant to … a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution." ISDA § 450j–1(b). As noted elsewhere in this opinion, *supra* at 1349, the conference report accompanying the 1995 Appropriations Act expressly approved of the House and Senate Reports, both of which embraced *prorata* funding. The Secretary challenges the constitutionality of § 450j–1(b)'s attempt to incorporate into the statute language in a *future* conference report, citing the Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Because we find "law to apply" elsewhere in the text of the ISDA, we need not look to the 1995 conference report and therefore need not address the constitutional concerns implicated by § 450j–1(b).

commits the allocation of insufficient funds to agency discretion—which we have just determined it does not—section 450k of the statute prohibits the Secretary from imposing the type of requirement and penalty at issue in this case.

According to the statute, the Secretary may not promulgate any regulation or nonregulatory requirement, "except that the Secretary ... may promulgate *regulations* under [the Act] relating to [one of sixteen topics not related to this case]." ISDA § 450k(a)(1) (emphasis added). Even with respect to the areas in which the Secretary *is* permitted to promulgate regulations, he may do so only after satisfying the APA's notice and comment procedures and consulting with representatives of Indian Tribes. *See id.* § 450k(d). The legislative history to this section notes that "[b]eyond the areas specified in [the Act] (such as the Federal Tort Claims Act, declination appeal procedures, the Contract Disputes Act, etc.), no further delegated authority is conferred." S.REP. NO. 103–374, 103d Cong.2d Sess. 14 (1994); A.A. 32.

Thus, if the policy established in the 1995 Notice constituted a "regulation," it violated the statute because it was never subjected to notice and comment procedures. If, on the other hand, the provision constituted a "nonregulatory requirement," it violated the ISDA's absolute ban on the imposition of such policies. Not surprisingly, then, the Secretary argues that the "June 30/50% rule" laid out in the Notice was *neither* a regulation nor a nonregulatory requirement. Brief for Appellees at 37. Section 450k does not apply to the Notice, the Secretary claims, because the June 30/50% rule "does not require anything from the tribes ... and does not impose any requirements or penalties." *Id.* Thus, he argues, the policy qualifies as a "general statement of policy," which falls outside the scope of both § 450k and the APA's notice and comment procedures.[15]

This argument, however, hinges on the unreviewability argument we have just rejected, since it relies on caselaw defining "general statements of policy" as "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a *discretionary* power." *Id.* at 36 (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, [302] n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)) (emphasis added). But we have already determined that the allocation of insufficient CSF did *not* fall within the scope of the Secretary's limited discretionary powers, and *ipso facto* that the Notice of that allocation plan cannot constitute a general statement of policy.

Moreover, the Supreme Court has stated that one of the criteria separating rules from policy statements is that "a purported policy statement genuinely leaves the agency and its decisionmakers free to exercise discretion." *Community Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C.Cir.1987). In this case, both the language of the Notice (announcing that late Tribes "are eligible" for only half of their CSF) and the Secretary's defense of the Notice on appeal make it evident that this new allocation policy was not to be administered in a flexible way, but as an unequivocal requirement subject to penalty for failure to comply.

Rather than announcing a general policy, the Notice imposes on the Tribes a "requirement" in the truest sense of the word; under the 1995 plan, Tribes are *required* to meet the new June 30 deadline or accept a 50% reduction in their CSF entitlement. Thus we find that the Secretary's decision to institute a 50% penalty for Tribes submitting late CSF proposals exceeded his limited authority under the ISDA.

## C. *Rule 19*

 Finally, the Secretary argues that the nonplaintiff Tribes slated under the Notice policy to receive the funds currently under injunction are necessary and indispensable parties to this litigation. Rule 19(a) of the Federal Rules of Civil Procedure describes an absent party as "necessary" if that party "claims an interest relating to the subject of

---

15. The APA's notice and comment provision expressly exempts "interpretative rules, general statements of policy, or rules of agency organiza-

tion, procedure, or practice" from its procedural requirements. 5 U.S.C. § 553(b)(3)(A).

the action and is so situated that the disposition of the action in the [party's] absence may ... as a practical matter impair or impede the [party's] ability to protect that interest." FED.R.CIV.P. 19(a). If the court determines that a party is necessary under Rule 19(a), it must then balance the equitable factors listed in Rule 19(b) to determine if that party is "indispensable."[16] *Id.*

Our Rule 19 analysis must begin with an assessment of whether the nonparty Tribes have a legally protected interest in the enjoined CSF funds. We do not find that the Tribes have any such interest. The Secretary's own affiant has declared that distribution of the remaining funds among the nonparty Tribes would entail significant administrative hassle and would result in "benefit[s] to the individual [Tribes which] would be negligible." Because of the large hassle and negligible benefits, the affiant concluded that the released funds "most definitely *would not* be used to increase existing contracts to a higher funding level." Affidavit of Daisy West, Indian Self–Determination Analyst for the BIA at 2 (Sept 27, 1995) (emphasis in original) ("West Aff."); J.A. 165.

 Even if we were to assume that the nonparty Tribes *did* have a legally protected interest in the remaining 1995 appropriations, we would still conclude that they are not necessary parties. Although the allocation of a fixed fund may create a protectable interest in the beneficiaries of that fund, *see Makah Indian Tribe v. Verity*, 910 F.2d 555,

558 (9th Cir. 1990), the United States may adequately represent that interest as long as no conflict exists between the United States and the nonparty beneficiaries. *Id.* If the nonparties' interests are adequately represented by a party, the suit will not impede or impair the nonparties' interests, and therefore the nonparties will not be considered "necessary." *Id.; see also Burka v. Aetna Life Ins. Co.*, 917 F.Supp. 8, 12 (D.D.C.1996) (nonparties with contractual right to use property at issue in suit not entitled to intervene as of right because property owner adequately represented nonparties' interests); *Financial Gen. Bankshares, Inc. v. Metzger*, 523 F.Supp. 744, 773 (D.D.C.1981) (law firm beneficiary of funds sought to be recovered by plaintiff not necessary party because adequately represented by defendant attorney represented by the nonparty law firm), *vacated on other grounds*, 680 F.2d 768 (D.C.Cir.1982).

We see no conflict in this case between the Secretary's interest and the interest of the nonparty Tribes. *See Cassidy v. United States*, 875 F.Supp. 1438, 1445 (E.D.Wash. 1994) (nonparty Tribes not necessary where the United States would have the court construe the law in essentially the same fashion as the Tribes and therefore the United States can adequately represent the Tribes' interests). The nonparty Tribes' only potential interest in this case is in having the enjoined funds distributed according to the Secretary's Notice, under which each Tribe will receive its estimated *pro rata* share amounting to less than $100. *See* West Aff.

---

16. Rule 19 provides:

 **(a) Persons to be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest....

 **(b) Determination by Court Whenever Joinder not Feasible.** If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

FED.R.CIV.P. 19.

at 2; J.A. 165. Because the Notice does not give the Secretary discretion to give one of the nonparty Tribes a greater share than another nonparty Tribe, there is no concern that the Tribes' interests might conflict with one another and keep the Secretary from adequately representing them all. *Compare Shermoen v. United States,* 982 F.2d 1312, 1318 (9th Cir.1992) (United States cannot adequately represent interest of nonparty Tribes where "competing interests and divergent concerns of the tribes" might conflict with United States' role as trustee), *cert. denied* 509 U.S. 903, 113 S.Ct. 2993, 125 L.Ed.2d 688 (1993).

In sum, the disposition of this case absent the nonparty Tribes will not impair the Tribes' ability to protect any interest—even if they have one—in the enjoined funds; accordingly, we hold that the Tribes are not necessary and indispensable parties under Rule 19.

### III. Conclusion

We conclude that the ISDA does *not* commit the allocation of insufficient CSF to the Secretary's discretion, and that the Act provides sufficient law to apply on judicial review of any such allocation. On the merits, we hold that the Secretary's decision to institute the 50% penalty exceeded his limited authority and violated the ISDA. Finally, we find that the nonparty Tribes which, under the Secretary's allocation plan, might have received minute incremental amounts of the now-enjoined funds are *not* necessary and indispensable parties under Rule 19. Accordingly, we reverse the district court's denial of the plaintiff Tribes' motions for preliminary injunctions and remand for further proceedings consistent with this opinion.

*So ordered.*

SILBERMAN, Circuit Judge, dissenting:

The Secretary is accused of making an "audacious claim" that in the event Congress did not provide full appropriations, the Secretary was delegated discretion (not reviewable by us) to determine how funds were to be distributed among the tribes. Since the Secretary's position is firmly based on the plain statutory language as well as a recent Supreme Court decision, his position, whether described as bold or timid, to me seems unassailable. I therefore respectfully dissent.

I do not quite understand the majority's reasoning. The majority inexplicably bifurcates the question of reviewability and law to apply, yet the question of reviewability entirely depends on whether there is statutory law to apply. Nor is it apparent exactly how the majority applies the "law" that it discerns. The Secretary does enjoy discretion as to how to allocate CSF in light of Congress' failure to provide full funding, but as the majority puts it, he is obliged to "follow as closely as possible the allocation plan Congress designed in anticipation of *full* funding." *See* Maj. Op. at 1348. We are not told, however, why the Secretary's approach failed the "as closely as possible" test; the majority just seems to prefer a *pro rata* distribution based on either the tribes' 1994 funding or its 1995 requests.

The majority holds that the Secretary's policy is illegal both for substantive reasons (failing the "as closely as possible" test) and because the policy was a *de facto* regulation issued contrary to the APA and in excess of the Secretary's statutory authority to issue regulations. One would expect, then, that the district court would be obliged to remand the case to the Secretary for him to take another crack at the problem, to exercise again that "discretion" that the majority acknowledges. Yet, the majority makes an absolutely unprecedented suggestion that the district court "might choose to hold a hearing at which the appellant tribes and the Secretary could address the precise distribution of the escrowed funds." Maj. Op. at 1341 n. 2. That approach turns principles of administrative law on their head, *e.g., SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947), because it postures the district court as the primary decisionmaker rather than as a reviewing court with only a limited writ under the APA. It would appear that the majority, understandably reluctant to hold that the tribes have a legal entitlement to some sort of a *pro rata* share of the funds, nevertheless hopes

the district court's order will *de facto* accomplish that result. But unless the tribes have a legal entitlement to a *pro rata* share of the funds, they have no more legal claim to the escrowed funds than other tribes to which the Secretary, in his discretion, might distribute these funds. (The escrowed money apparently was taken from the tribes who timely filed, but there are another 44 tribes who also suffered a 50% late "penalty" and who thus stand in the same shoes as appellants.) The majority, by stating otherwise, Maj. Op. at 1341 n. 2, is simply trying to span the unbridgeable analytic gap between recognizing the Secretary has discretion and forthrightly holding that the tribes have an entitlement to a particular amount of funds. The confusion I perceive in the majority's opinion and its disposition of the case stems, I believe, from an unsuccessful effort to tease statutory law out of a vacuum, a vacuum Congress deliberately created.

It is true that Congress, under the ISDA, restricted the Secretary's discretion to award CSF among the tribes—requiring full funding for all—*if* Congress appropriated sufficient funds for these programs. But § 450j-1(b), as the district court properly observed, unequivocally stated that any tribes' *legal entitlement* to funds ("the provision of funds") was dependent on Congress making full appropriations:

> Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

25 U.S.C. § 450j-1(b) (1994). That means the Secretary is under no *legal* obligation in the event of a shortfall to meet any particular ratio of distribution among the tribes. That, of course, does not mean that the Secretary would feel free to award all of these funds to one favorite tribe. Putting aside constitutional restraints, one can only imagine Congress' and the President's outraged reactions to such a misuse of discretion. It may well be that the federal judiciary is prone to think

of itself as the indispensable guarantor that executive branch officials will behave in a reasonable manner, but, if so, that perception is unwarranted.

The majority, apparently dismayed that affording the plain meaning to this clause will permit the Secretary to exercise his discretion unreasonably, offers a restrictive interpretation not even the appellants suggest. Both parties agreed that the relevant words for our case were "[n]otwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations...." But the majority reads the words after the word "*and*" as somehow restricting the meaning of the words before: The tribes do *mirabile dictu* have an entitlement to some "provision of funds" that bears as closely as possible a relationship to the amounts they would receive under full funding. The Secretary is merely excused from making up a full appropriation for contract support by taking appropriations away from tribal programs, projects, or activities. There are several difficulties with the majority's construction, which may explain why appellants never offered it. The first is that the second part of the sentence is introduced by the word "and," which hardly suggests an intent to limit the first part. The second is that the majority's reading effectively makes the second clause meaningless; if under the first clause, the Secretary is not required to allocate to the tribes more CSF than are appropriated by Congress, he clearly would not be obliged (under the second clause) to take money from tribal programs to do so. And the majority, straining to find a plausible reading, literally changes the words of the second clause. The clause does not read, as the majority paraphrases it, "the Secretary cannot be forced to take money from a program serving a Tribe ... *in order to make up for a CSF appropriations shortfall,*" Maj. Op. at 1346 (emphasis added). It says the Secretary cannot be forced to take money from a program, project, or activity serving a tribe *in order to fund another tribe.* This suggests, quite contrary to the majority's reading, that *tribes* can be funded *unequally.* The second clause thus makes clear that the Secretary, at the time he receives an insuffi-

cient appropriation from Congress, is not legally obliged to divert *any* funding *under the subchapter,* which includes both CSF and contract funds, for any purpose away from one or more tribes to give to another.[1] In other words, he does not in 1995 have to reduce one tribe's funding, from either its 1994 funding level or its 1995 requested funding, to fund another tribe at a prior or requested level. Yet, that is exactly what this lawsuit seeks. To say, as does the majority, that its opinion does not do so because "each tribe had a *right* only to the amount of CSF it would have received under a legal allocation plan," Maj. Op. at 1342 (emphasis added), is circular; the majority assumes a right or entitlement that does not exist and that it does not purport to find.

Obviously, anytime the Secretary is asked to increase his proposed funding for one or more tribes out of a limited appropriation, he necessarily must reduce funding for the rest. There is no escaping the zero sum game. Congress, apparently unwilling to provide statutorily for distribution ratios in the event of an appropriations shortfall, left it to the Secretary (or subsequent appropriations bills) to deal with that eventuality. The majority's textbook hypothetical, offered to explain why the Secretary's discretion is so limited, is defective. The majority suggests that the principal could order students to share books or to rotate books on reserve, but this aspect of the book hypothetical undoes the analogy; funds cannot be shared. Moreover, if the principal need only follow the "formula" "as closely as possible," it is not clear why the Secretary's approach is invalid. He chose to distribute funds equally to all tribes meeting a deadline, which was necessary to allow prompt allocation and adequate tribal planning; those who failed to meet the deadline, rather than losing all funding, would receive a set percentage based on their most recent filing.[2] Under the majority's hypothetical, a comparable situation would result if the principal, faced with a book shortage, gave students who came to school the first day a book, but required students who missed the first day to share the leftover books. The majority concedes that "[i]t is not at all clear that this scenario *would* violate the regulation," Maj. Op. at 1347 n. 11, so I am at a loss to understand why the Secretary's distribution violates the statute. He has done the same thing—as full funding as possible for timely tribes, and "sharing" of the remaining funds for tardy tribes. He thus meets the majority's insistence that everyone have adequate "access" to funds; he in fact created the 50% benefit rule for late-filing tribes precisely to ensure such access. The real problem is that the majority wants to impose its own definition of "adequate." However, the clear implication of the majority's hypothetical is that the Secretary does *not* have to treat timely and tardy tribes alike; as the majority points out, and we agree, § 450j–1(b)'s second sentence as applied to the hypothetical means that the principal does *not* have to take a

---

1. The majority claims, at 1346 n. 10, that this leaves tribes with "no legal remedy" if the Secretary were either to give the entire appropriation to one tribe or to use the funds for "unrelated programs." We are presented with neither of these situations. Nevertheless, the former ignores constitutional restraints on the Secretary. And as to the latter, we very much doubt that the appropriation in this case could be read to allow the Secretary to spend the $95,823,000 *appropriated in response to his request for CSF* on other programs. The most straightforward reading of Congress' appropriation of "not to exceed $95,-823,000" for CSF is that Congress expected the Secretary to spend that amount on CSF; Congress knew it was appropriating *less* than the requested funds, and for that reason specified that it intended to *limit* the amount the Secretary could put toward CSF. A decision by the Secretary to spend that money elsewhere thus would seem to violate the 1995 Appropriations Act. If,

by contrast, the appropriation were "lump sum" as to all ISDA expenditures, it would be a direct parallel to *Lincoln. See infra* at 1342. (Of course, as the majority notes, if a particular distribution *were* determined to be unlawful, the Secretary would be obliged to "correct" it.)

2. It is significant that appellant tribes *concede* that a deadline is both necessary and appropriate; they protest only the 50% "penalty." But inherent in the power to impose a deadline is the power to establish consequences for those failing to meet it. Thus, the tribes' argument implicitly is that the consequences here are too severe—but according to what standard? I think it likely that the Secretary lawfully could remove *all* funding from tardy tribes; his decision to award them 50% of the prior year's funding is thus, as he claims, a benefit intended to mitigate the tribes' failure to file.

book from a timely student to give it to a tardy student. Maj. Op. at 1346.

In any event, requiring close adherence to a "formula" is flatly improper where the Secretary has express statutory discretion over the allocation of a fund. The Supreme Court's decision in *Lincoln v. Vigil*, 508 U.S. 182, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993), is very much on point. There, Congress appropriated a lump sum without indicating how the funds were to be distributed among programs administered for the tribes by the Indian Health Service. The Department of Interior reprogrammed those funds and the court held that its actions were unreviewable. The Court refused to consider legislative history put forward as "law" limiting the Secretary's discretion because it was disconnected to any statutory language. To be sure, were it not for § 450j–1(b), this case would be distinguishable. But that is like saying if my aunt had wheels, she would be a trolley car. That provision exists, and it wipes out, according to its clear command, the law that otherwise would apply, leaving the Secretary with unreviewable discretion. For that reason, our old case, *City of Los Angeles v. Adams*, 556 F.2d 40 (D.C.Cir.1977), even if it survives *Lincoln* unimpaired, is inapposite. There we held that an agency was obliged to consider the authorizing statute's mode of distribution of funds in the event of an appropriations shortfall, but as the government notes, the authorizing statute there did not include a provision suspending congressional guidelines in such circumstances.

Nor, as the majority recognizes, Maj. Op. at 1349, does the 1995 Appropriations Act provide law to apply; it is silent on the issue. Although appellants rely on a conference report that arguably called for *pro rata* funding to support their position, as *Lincoln* recognized, legislative "history" which lacks a "statutory reference point is of no legal consequence." 508 U.S. at 191–94, 113 S.Ct. at 2031–32; *see also International Bhd. of Elec. Workers v. NLRB*, 814 F.2d 697, 712 (D.C.Cir.1987). And insofar as the tribes would combine that report with the ISDA § 450j–1(b), which states that the Secretary shall not reduce funding except, *inter alia*, in accordance with a conference report on a

*subsequent* appropriations bill, that construction, as the government vigorously asserts, would run afoul of *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). With no statutory anchor in the 1995 Act, giving legal effect to statements in the committee reports effectively would allow a congressional committee to amend the ISDA. Similarly, what a congressional committee—or even the entire Congress—in 1995 may have assumed was meant by the 1988 ISDA is of no legal significance unless the 1995 Congress enacts that assumption. *See United ed Ass'n of Journeymen and Apprentices v. Reno*, 73 F.3d 1134, 1139 n. 4 (D.C.Cir.1996).

There remains the question whether the Secretary's mode of distribution was announced by a rule contrary to his limited statutory authority to issue regulations, and if so, whether that rule was issued in violation of the APA's notice and comment provisions. *See* § 450k. As the majority recognizes, that question largely turns on whether he had discretion to award the inadequate funds. Yet the majority concedes that he had some discretion. Therefore, he obviously needed to communicate his policy in some fashion. And in any event, § 450k, like any other provision of the Act, does not apply when § 450j–1(b) overrides.

\* \* \* \* \* \*

It may well be that *certain* Congressmen wished that the tribes receive the *pro rata* distribution which the majority desires, but no law directing that result emerged. My view is that a disciplined reading of the actual statute and *Lincoln v. Vigil* leaves us with no principled alternative but to accept the Secretary's argument.