HARTZ, Circuit Judge,
dissenting:
I respectfully dissent. There is much in the majority opinion with which I agree. And the result advocated by the government is not easy to swallow — the BIA hands over programs to tribal organiza *1078 tions but then does not reimburse the organizations for the full costs of running the programs. But in my view congressional intent is clear, all parties should have understood (and indeed did understand) that intent, and we must construe the contracts at issue in accordance with that understanding. The majority opinion’s approach strikes me as too formalistic in relying on a sharp division between line-item and lump-sum appropriations. It renders futile the spending cap imposed by Congress. And to the extent that the majority opinion relies on Cherokee Nation v. Leavitt, 543 U.S. 631, 125 S.Ct. 1172, 161 L.Ed.2d 66 (2005), for support, it fails to explain why the Supreme Court found it necessary to address in its opinion so many issues that would be irrelevant if the Court had embraced the view of government contracts that the majority opinion adopts.
I. BACKGROUND
The majority opinion provides a thorough discussion of the relevant statutory and administrative background. In this section I will focus on the statutory context and a few facts that illuminate the parties’ necessary understanding of their contractual relationship.
First, beginning in fiscal year 1994, Congress set a maximum limit on how much the BIA could allocate from its budget for contract-support costs (termed “indirect costs” in that appropriations act, and “contract-support costs” thereafter). This was a change from prior-year appropriations, which had provided a designated amount for contract-support costs but had not prohibited the BIA from supplementing that amount with unrestricted funds available in the remainder of the appropriation to the BIA. (The appropriations-bill language at issue in Cherokee Nation was essentially the same as in the pre-1994 BIA appropriations.) Ordinarily, there would be no great difficulty in an agency’s complying with such a spending cap. The agency could simply refuse to enter into more contracts than it had the money to pay for. But that course was unavailable to the BIA under the ISDA. If a tribal organization wished to take over an eligible program from the BIA, the BIA had to relinquish its control and fund the organization’s takeover, except in quite limited circumstances. See 25 U.S.C. § 450f(a)(2).[1] And the BIA’s contract with the tribal organization to fund the program could not exclude contract-support costs. See id. § 450j-l(a). The congressional limitation on contract-support costs could therefore be effectuated by the BIA only by refusing to pay costs that would otherwise be mandated by statute. In other words, when Congress capped contract-support expenditures, it necessarily understood that the cap must override what would otherwise have been statutory commands to pay contract-support costs in full on each contract mandated by the ISDA.
Second, there was no secret that. the BIA planned to pay only a portion of contract-support costs on each ISDA contract. As set forth in the majority opinion, some months after enactment of each of the relevant appropriations bills, the BIA would publish a notice in the Federal Register stating the amount of contract-support appropriations that it had received and explaining the allocation method should that amount be insufficient to pay for all contract-support costs negotiated in its ISDA contracts. The notice for fiscal year 1994 also forecast the magnitude of the potential shortfall in contract-support funding:
*1079 Using FY 1993 experience which resulted in a total CSF [contract-support fund] need of approximately $85,000,000, we project a shortfall of at least $10,000,000 in FY 1994 and possibly a shortfall as high as $25,000,000. It is important to restate that the Bureau can only utilize the amount appropriated for the CSF account to meet indirect cost needs. That is, the Bureau can no longer reprogram funds from other Bureau accounts to cover CSF shortfalls.
58 Fed.Reg. at 68694. Notices in later years did not project the amount of shortfalls; but their language (indeed, their very purpose) warned tribal organizations of the possibility of insufficient funding.
All notices described essentially the same method for distributing contract-support funds in the event of a shortfall. A specified sum (or nothing at all, see 64 Fed.Reg. at 2659 (fiscal year 1999)) was set aside for new or expanded contracts; such contract-support funds were usually to be distributed on a first-come, first-served basis. See, e.g., 62 Fed.Reg. at 1470 (fiscal year 1997). For ongoing or existing contracts, in the event of a shortfall “the amount available shall be distributed pro rata, so that all contractors and compactors receive the same percentage share of their reported need.” 66 Fed.Reg. at 15276 (fiscal year 2001).
The notices further advised that the BIA would not distribute the tribal organizations’ final contract-support payments until about July 31, well after they were supposed to have begun performance under their contracts.[2] In practice, the tribal organizations often were not told precisely how much each would be paid in contract-support funds until late September. Between fiscal years 1994 and 2001, the tribal organizations were paid 77% to 92% of their contract-support costs.[3]
The AFAs recognized that contract-support costs might not be fully paid. Although the template for AFAs may have changed over the years and the AFAs in the record may not be representative in various respects, they are illustrative of how tribal organizations and the BIA dealt with the tentativeness of contract-support *1080 funding. The Oglala AFA for calendar year 2001 is quite explicit. Its section entitled “Program and Budget” includes the following paragraph:
Contract Support Funds shall be provided by the Bureau of Indian Affairs, subject to the availability of funding, in accordance with the Indirect Cost Negotiation Agreement between the Contractor and the Office of the Inspector General, and in accordance with Bureau of Indian Affairs policies and procedures pertaining to the distribution of Contract Support Funds.
J.App., Vol. IV at 900 (emphasis added). A paragraph entitled “Billings for Indirect Cost” in the “Administration Data” section explicitly recognizes that Oglala may be reimbursed for only a percentage of the indirect contract-support costs computed by using the indirect-cost rate. It states:
The contractor shall bill for Indirect Cost earned on his voucher\invoice showing the following, for the period covered by the vouchePinvoice:
1. Total direct cost expenditures.
2. Less Exclusions.
3. Times Indirect Cost Rate.[4]
4. Times percentage of rate funded by BIA.
5. Indirect Cost earned for the period covered. (1) — (2)X(3)X(4)=(5).
Id. at 920 (emphasis added). In other words, the full amount of indirect contract-support costs will be reduced by multiplying it by a “percentage of rate funded by BIA.” This computation follows the same steps as those for indirect-contract-support-cost computations set forth in the BIA’s notice of “Distribution of Fiscal Year 2001 Contract Support Funds.” See 66 Fed.Reg. at 15276.
Not only were the tribal organizations on notice that contract-support costs may not be fully funded, but their representatives may even have acquiesced in the shortfall, recognizing that in light of limited willingness of Congress to fund programs benefitting Native Americans, other needs should take priority over contract-support costs. A study by the GAO reported that there were two reasons for underfunding contract-support costs:
First, it is difficult for [the BIA and the Indian Health Service] to predict what *1081 the total need for indirect cost funding will be in advance. The agencies do not know which tribes will be contracting which programs, at what level the contracted programs will be funded, and what a tribe’s indirect cost rates will be. Second, in addition to the difficulty of predicting the future contract support requirements, the agencies have had other funding priorities in recent years. For example, BIA’s priorities have been to seek additional appropriations for law enforcement to reduce crime on the reservations and for Indian education.
J.App., Vol. III at 541. Those priorities are to be set after consultation with the Native American community. See 25 U.S.C. § 450j-1(i) (“On an annual basis, the Secretary shall consult with, and solicit the participation of, Indian tribes and tribal organizations in the development of the budget for the ... Bureau of Indian Affairs (including participation of Indian tribes and tribal organizations in formulating annual budget requests that the Secretary submits to the President for submission to Congress ... ).”).[5]
Another good indication that everyone understood, or should have understood, that the appropriations cap would require reductions in contract-support payments in all the BIA’s ISDA contracts can be found in a brief submitted some 16 years ago by one of the law firms representing Plaintiffs in this appeal. In Ramah Navajo School Board., Inc. v. Babbitt, 87 F.3d 1338 (D.C.Cir.1996), the school board successfully challenged how the Secretary of the Interior apportioned to the tribes the restricted contract-support appropriations for fiscal year 1995. (The plaintiffs in that case did not challenge, as in this case, the failure to pay full contract-support costs.) The Secretary had set a June 30, 1995, deadline for submitting proposals for indirect-cost rates. Tribal organizations that missed the deadline would receive only 50% (instead of 75%) of full funding on the first round of distribution. See 59 Fed.Reg. at 55318 (fiscal year 1995). In the second round the remaining funds would be apportioned pro rata to the deadline-compliant tribal organizations, who ultimately received more than 90% of full funding. See Ramah Navajo Sch. Bd., 87 F.3d at 1343. The brief submitted by counsel for the school board asserted: “Congress in the [ISDA] and the contemporaneous appropriation statutes clearly intend[ed] an even, across-the-board reduction in all tribal contracts in the event of an appropriations shortfall.” (Appellant’s Brief at 27, Ramah Navajo Sch. Bd., Inc. v. Babbitt, Nos. 95-5334, 95-5348) (D.C.Cir. Nov. 15,1995) (footnote omitted).
II. ANALYSIS
Given the obvious intent of Congress, which was communicated by the BIA to tribal organizations receiving ISDA funds and was surely understood by them, affirmance of the district court is required *1082 unless some legal doctrine overrides congressional intent. In my view, however, the governing doctrine confirms the need for affirmance.
A. Congressional Appropriations and Government Contractual Liability
The Appropriations Clause of the United States Constitution states, “No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.” U.S. Const. art. 1, § 9, cl. 7. To prevent the Executive from forcing its hand by incurring contractual debts on behalf of the United States, Congress has enacted the Anti-Deficiency Act which, with certain limited exceptions, prohibits federal agencies from contracting for more than what Congress appropriates. See 31 U.S.C. § 1341(a)(1)(A), (B). The Act states in part:
An officer or employee of the United States Government ... may not—
(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; [or]
(B) involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law....
Id. § 1341(a)(1). Consequently, government contracts generally are not binding until Congress appropriates the necessary funds. See Cherokee Nation, 543 U.S. at 643, 125 S.Ct. 1172.
On occasion, however, a law may grant a government officer or employee what is known as “contract authority” — that is, the authority to enter into a contract that is binding regardless of whether Congress appropriates sufficient money to cover the contract. See Train v. City of New York, 420 U.S. 35, 39 n. 2, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975); see generally I General Accounting Office, Principles of Federal Appropriations Law p. 2-6 (3d ed. 2004) (GAO Redbook). In that event, if the appropriation turns out to be inadequate, the contractor can sue the government for underpayment. See GAO Redbook at p. 2-7. A grant of contract authority, however, must be clear. As stated in 31 U.S.C. § 1301(d): “A law may be construed to make an appropriation out of the Treasury or to authorize making a contract for the payment of money in excess of an appropriation only if the law specifically states that an appropriation is made or that such a contract may be made.”
Plaintiffs make two principal arguments in support of their claim to full payment of ISDA contract-support costs: They assert (1) that the Secretary had contract authority to bind the government to pay contract-support costs regardless of the sufficiency of appropriations, and (2) that even if the Secretary lacked contract authority, the congressional appropriation for contract-support costs was sufficient for each separate contract, so that the government is bound even if there were insufficient funds to pay the total of such costs for all ISDA contracts. I first address contract authority.
B. Did the BIA have Contract Authority for Contract-Support Costs?
Plaintiffs contend that Congress granted the Secretary contract authority to enter into ISDA contracts when it directed the Secretary to pay in full the contract-support costs on ISDA contracts (regardless of the adequacy of appropriations for those costs). They acknowledge the following language of 25 U.S.C. § 450j — 1(b) that limits the provision of funds to what is appropriated:
Notwithstanding any other provision in this subchapter [the entire ISDA], the provision of funds under this subchapter is subject to the availability of ap *1083 propriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.
(Emphasis added). They argue, however, that this language does not limit the government’s financial obligation for contract-support costs.
To begin with, Plaintiffs remind us that the ISDA’s legislative history reflects congressional intent that tribes not be penalized by government underpayment of contract-support costs. See S. Rep. 100-274, as reprinted in 1988 U.S.C.C.A.N. at 2628 (“the Committee believes strongly that Indian tribes should not be forced to use their own financial resources to subsidize federal programs.”). They then point to two ISDA provisions suggesting a categorical government obligation. The first is § 450j-l(a)(2), which states:
There shall be added to the amount required by paragraph (1) [ (the Secretarial amount) ] contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—
(A) normally are not carried on by the respective Secretary in his direct operation of the program; or
(B) are provided by the Secretary in support of the contracted program from resources other than those under contract.
(Emphases added). The other is § 450j-1(g) (added to the ISDA six years after enactment of the subject-to-availability language of § 450j — 1(b)), which speaks of contract-support costs as an entitlement:
Upon the approval of a self-determination contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under subsection (a) of this section, subject to adjustments for each subsequent year that such tribe or tribal organization administers a Federal program, function, service, or activity under such contract.
(Emphasis added).[6] In light of this mandatory language, Plaintiffs contend that the subject-to-availability restriction on “the provision of funds under this subchapter,” § 450j — 1(b), must limit only payments by the Secretary, not the government’s ultimate liability. Under their construction of the statute, “payment of the full amount by the Secretary is subject to available appropriations to make those payments, but if such appropriations are not available then the underpaid contract obligation remains in place and the government remains liable in damages.” Aplt. Br. at 49-50.
*1084 Plaintiffs’ argument is interesting, but unpersuasive. They do not explain why there would be any reason to include in the ISDA a provision saying that the Secretary cannot pay out money that has not been appropriated. Such a provision would seem superfluous. If such payments are not barred by the Constitution’s Appropriations Clause, then the Anti-Deficiency Act should do the trick. One could also wonder what good Congress thought it would accomplish by restricting payments by the Secretary but not the liability of the government. The effect on the overall federal budget would be the same whether the money comes from the Secretary’s budget or from the fund used to pay judgments for the government’s breach of contractual duties. See 31 U.S.C. § 1304 (judgment fund). When Congress says that “the provision of funds under this subchapter [the ISDA] is subject to the availability of appropriations,” 25 U.S.C. § 450j — 1(b), it must mean that the government’s obligation on ISDA contracts is limited by the amount appropriated.
As for the addition of § 450j-l(g) several years after enactment of the subject-to-availability language in § 450j — 1(b), if subsection (g) were intended to limit the reach of that language in subsection (b), one would expect Congress to have been explicit about it, as required by 31 U.S.C. § 1301(d) (contract authority must be “specifically state[d]”). Yet Congress did not bother to amend § 450j — 1(b) to say that the subject-to-availability provision that otherwise applies to the entire ISDA does not apply to contract-support costs.
Most importantly, Plaintiffs’ construction of the subject-to-availability provision is contrary to the Supreme Court’s view. Referring to § 450j-l(b), Cherokee Nation said:
Language of this kind is often used with respect to Government contracts. This kind of language normally makes clear that an agency and a contracting party can negotiate a contract prior to the beginning of a fiscal year but that the contract will not become binding unless and until Congress appropriates funds for that year. It also makes dear that a Government contracting officer lacks any special statutory authority needed to bind the Government without regard to the availability of appropriations.
543 U.S. at 643, 125 S.Ct. 1172 (citations omitted; emphasis added). I therefore conclude that the Secretary did not have contract authority to bind the government to pay full contract-support costs regardless of the adequacy of appropriations.
I now turn to Plaintiffs’ argument that there were available funds to pay each tribal organization’s contract-support costs in full.
C. Were Funds Available for Full Payment of Contract-Support Costs?
Plaintiffs’ principal argument is not predicated on the Secretary’s alleged contract authority to bind the government to pay contract-support costs in full. Rather, they contend that sufficient appropriations were “available” to pay each individual tribal organization’s contract-support costs in full, so the government cannot escape liability by relying on the insufficiency of appropriations to pay the total of such costs for all tribal organizations. Aplt. Br. at 1.
Before addressing the decisions relied upon by Plaintiffs, I would note two classic Supreme Court opinions on the enforceability of unfunded contracts. They establish that a contractual subject-to-availability provision ordinarily forecloses recovery of otherwise promised payment in excess of appropriations; that is, by agreeing that payment is subject to the availability of *1085 appropriations, the contractor accepts the risk of congressional underfunding.
Bradley v. United States, 98 U.S. 104, 25 L.Ed. 105 (1878), concerned the lease of a building for government use. In accordance with statutes barring federal agencies from entering into contracts for amounts exceeding appropriations, see id. at 107-08, the three-year lease stated that it was “subject to an appropriation by Congress for the payment of the rental herein stipulated for, and that no payment shall be made to [Bradley] on account of such rental until such appropriation shall be available,” id. at 105-06 (internal quotation marks omitted). During the first two full years of the lease term, Congress appropriated $4,200, the full contract price, specifically for the lease; but in the last year it appropriated only $1,800. See id. at 108 (the first-year appropriation also included rental for the first three weeks of the lease, which were in the prior fiscal year). The Court rejected the claim for the balance by Bradley’s successor. It said that the parties’ intent, as evidenced by the lease’s availability provision, was that the lessor would not be paid until appropriations became available. See id. at 112. That provision placed the underfunding risk on the lessor:
Public officers, ... having no funds in the treasury and being without authority to bind the United States, can only agree to pay the stipulated rental, provided the money is appropriated by Congress, and if the lessor, voluntarily and without any misrepresentation or deception, enters into a lease on those terms, he must rely upon the justice of Congress.
Id. at 117.
Sutton v. United States, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099 (1921), teaches a similar lesson. The government contracted with the Hillsboro Dredging Company (whose assets were later assigned to Sutton as bankruptcy trustee) to conduct dredging and excavation work for a harbor-improvement project. See id. at 577, 41 S.Ct. 563. Hillsboro was to be paid at unit rates. See id. Congress appropriated $23,000 for the project. See id. “The appropriation was ample to defray the cost at [the agreed-on unit] rates, assuming that the quantities of material to be removed did not greatly exceed the estimates presented by the specifications.” Id. A statute limited the government’s contractual obligations to the amount of appropriations. See id. at 579, 41 S.Ct. 563 (“ ‘No act of Congress hereafter passed shall be construed to authorize the execution of a contract involving the payment of money in excess of appropriations made by law, unless such act shall in specific terms declare an appropriation to be made or that a contract may be executed.’ ” (quoting 34 Stat. 697, 764 (1906); ellipses omitted)). Accordingly, the contract provided that “within the limits of available funds the United States reserves the right to require the removal of such yardage as will complete the work, be it more or less than the quantities above estimated.” Id. at 577, 41 S.Ct. 563 (ellipses and internal quotation marks omitted). When it was discovered that the government inspector had underestimated the amount of work performed, work was halted. See id. But by that time the amount owed at unit rates substantially exceeded the congressional appropriation. See id. Sutton sued for the balance. See id. at 578, 41 S.Ct. 563. The Court held that “the contractor cannot recover for work done in excess of the appropriation.” Id. at 581, 41 S.Ct. 563. “The Secretary of War was ... without power to make a contract binding the government to pay more than the amount appropriated. Those dealing with him must be held to have had notice of the limitations upon his authority.” Id. at 579, 41 S.Ct. 563.
*1086 Plaintiffs argue that Bradley and Sutton are distinguishable because they concern only “restricted single-purpose appropriations” in which Congress has “designated] a specifically-appropriated sum for a given undertaking.” Aplt. Br. at 28. This case, they say, concerns instead a “lump-sum appropriation ],” id., which, although “capped at some level,” is “without limitation available for multiple projects or contractors ... and is thus ‘unrestricted,’ ” id. at 30. They contend that “[i]n the lump-sum situation ..., an agency’s exhaustion of an appropriation without fully paying the contract at issue ... does not bar the contractor from recovering damages for the non-payment.” Id. at 26-27 (emphasis omitted). In other words, “the government may be held liable for failing to pay a contractor in full out of an appropriation sufficient to pay that contractor, even though the appropriation is insufficient to pay all of the contracts the agency has made.” Id. at 27.
For support of their position, Plaintiffs rely in part on the Supreme Court’s decision in Cherokee Nation, 543 U.S. 631, 125 S.Ct. 1172, which awarded the plaintiffs in that case their full contract-support costs for ISDA contracts with the Secretary of Health and Human Services (HHS). I will discuss Cherokee Nation more fully later. For now, suffice it to say that the holding in that case is not helpful to Plaintiffs’ argument. True, the contracts were, as here, subject to the availability of appropriations. See id. at 640-41, 125 S.Ct. 1172. And, as here, the government argued that Congress did not appropriate enough money to cover the full contract-support costs for all ISDA contracts. See id. at 636, 125 S.Ct. 1172. But unlike our case, the appropriations acts had not used restrictive not-to-exceed language with respect to contract-support costs. (The acts were like the pre-1994 BIA appropriations acts.) Thus, the HHS Secretary’s contract-support spending was not statutorily restricted. And because there were sufficient unrestricted funds (in addition to the funds specifically appropriated for contract-support costs) available to cover the contract-support costs on the HHS Secretary’s ISDA contracts with the plaintiffs, the Court held that the subject-to-availability provision did not limit the government’s liability. See id. at 643, 125 S.Ct. 1172 (“Since Congress appropriated adequate unrestricted funds here, [the] phrase [‘subject to the availability of appropriations’], if interpreted as ordinarily understood, would not help the Government.”). To be sure, Plaintiffs here rely not just on the holding in Cherokee Nation but also on some of the Court’s language regarding the government’s liability on contracts paid for out of lump-sum appropriations. Before I turn to that language, however, it will be helpful first to analyze other relevant case law and to review the specific context of the dispute before us.
Most helpful to Plaintiffs is the holding in a lower-court decision cited with approval by Cherokee Nation. In summarizing propositions not disputed by the parties in that case, the Supreme Court cited Ferris v. United States, 27 Ct.Cl. 542, 546 (1892), for its statement that “[a] contractor who is one of several persons to be paid out of. an appropriation is not chargeable with knowledge of its administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects.” Cherokee Nation, 543 U.S. at 637-38, 125 S.Ct. 1172. Plaintiffs argue that under this Ferris doctrine, each tribal organization is entitled to full payment of its contract-support costs because the congressional appropriation for contract-support costs was many times greater than their individual amounts, and it is irrelevant to any particular tribal organization that the Secretary may have overcommitted the total appropriation by entering into other *1087 contracts. In my view, however, this argument takes Ferns too far.
Ferris considered a contract between the government and Ferris to dredge 100,-000 cubic yards of material from the Delaware River. See 27 Ct.Cl. at 542-43, 545. When the contract was executed, the agency allotted to it $37,000 out of a congressional appropriation for improvement of the river. See id. at 542-43. But the government halted work when only 35,494 cubic yards of material had been removed because the appropriation had been exhausted. See id. at 545-46. Ferris was fully paid $9,500 for the work performed; but he sought lost profits for the work that he was prevented from performing by the order to stop. See id. at 543, 545-46. The court awarded him $6,510 in damages. See id. at 547. Exhaustion of appropriated funds, it explained,
justified the officer in charge, but does not justify the [government] in not providing funds for carrying out and discharging [its] legal obligations. A contractor who is one of several persons to be paid out of an appropriation is not chargeable with knowledge of its administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects. An appropriation per se merely imposes limitations upon the Government’s own agents; it is a definite amount of money intrusted to them for distribution; but its insufficiency does not pay the Government’s debts, nor cancel its obligations, nor defeat the rights of other parties.
Id. at 546 (emphasis added).
This quoted proposition might appear to control the result here. After all, each tribal organization executing an ISDA contract would know that the congressional appropriation for contract-support costs was far more than sufficient to cover those costs for its own contract, and the organization would not be “chargeable with knowledge of [the] administration [of that appropriation], nor c[ould] [its] legal rights be affected or impaired ... by its diversion ... to other objects.” Id.
But one must not read too much into Ferris. It is, in essence, simply a case about contract interpretation. The legality of the contract was not at issue. Nor was there any doubt that the officer in charge was forbidden from making additional payments to Ferris once the appropriation was exhausted; the court noted that the officer was “justified” in stopping the work. Id. The sole question was the extent to which the government was bound on its contract with Ferris. To answer that question, courts follow the dictum that “[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.” Franconia Assocs. v. United States, 536 U.S. 129, 141, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002) (internal quotation marks omitted). Context, of course, is critical in interpreting contracts. What Ferris said is that in the circumstances of that case, where the government contracted to pay for certain work and sufficient funds to pay for the work had been appropriated (and even allocated to the contract), then the contractor could take the contractual promise as binding; the contractor did not need to worry about whether the funds would be reallocated while it was performing the contract. This would have been a reasonable assumption by the parties; and ordinarily it would be a reasonable construction of such a contract even if it contained subject-to-availability-of-appropriations language. See Cherokee Nation, 543 U.S. at 637, 125 S.Ct. 1172.
In other contexts, however, a court could properly interpret similar language differently. The effect of context is well-illus *1088 trated by the opinion of the Court of Claims in Blackhawk Heating & Plumbing Co. v. United States, 622 F.2d 539 (Ct.Cl. 1980), an opinion cited repeatedly by the Supreme Court in Cherokee Nation. It is worthwhile to describe Blackhawk in detail. The case concerned an agreement between the Veterans Administration (VA) and a contractor to resolve a dispute regarding cost overruns for construction of a hospital. See id. at 541. The parties settled on a compromise payment of $10.3 million. See id. The amount was to be paid in two installments: $8 million within 40 days of settlement, and $2.3 million within 90 days of settlement. See id. at 544. To pay the settlement, the VA needed to transfer (“reprogram”) funds that had been earmarked for other projects. See id. at 542. This was done, and the VA then sent letters notifying some congressional committees (those involved in VA appropriations) of the reprogramming. See id. at 543. But several members of Congress, after reviewing a GAO report on the settlement, wrote to the VA expressing concern about the payments. See id. at 544. When the VA decided to go forward with the settlement anyway, Congress enacted legislation retroactively barring any VA settlements exceeding $1 million absent an independent audit (which had not been prepared for the Blackhawk settlement), although the conference report on the legislation agreed that up to $6 million could be advanced on settlements that predated the law’s effective date. See id. at 544-45. The law was enacted on January 3, 1974; and on the same day the VA paid $6 million of the initial $8 million installment required by the settlement, about three weeks after it was due. See id. at 543, 545. The VA made no further payments. See id. at 546.
Blackhawk sued the VA for the unpaid settlement amounts plus interest. See id. The lawsuit turned on the meaning of Article 8 of the agreement, which stated: “The Government’s obligation hereunder is contingent upon the availability of appropriated funds from which payment in full can be made.” Id. at 542 (internal quotation marks omitted). The parties agreed on the meaning to some extent. They both thought that Article 8 at least made the agreement contingent on the VA’s reprogramming funds initially earmarked for other construction purposes, although it was everyone’s understanding that the contingency was highly likely to occur. See id. at 542-43, 546-47.
The VA contended, however, that Article 8 further limited its liability in two ways: (1) its obligation was contingent on approval of the reprogramming by congressional committees notified of it beforehand, see id. at 546-47, and (2) it was conditioned on there being no “affirmative action by the Congress that would prevent the [VA] from paying,” id. at 550. After examining the relevant statutory and regulatory framework, the parties’ course of dealing, and communications between the parties, the court disagreed with the VA on the first limitation but agreed on the second.
In rejecting the VA’s claim that Article 8 made payment to the contractors conditional on approval of reprogramming by the pertinent congressional committees, the court observed that no statute required such approval, no VA regulation stated that reprogramming would not go forward without congressional-committee consent, and no practice or policy of the VA prohibited unconsented-to programming. The court said that notification to the committees was merely a courtesy to maintain good relations with Congress. Moreover, it found that no one representing the VA had ever told Blackhawk that committee approval was necessary for reprogramming, and in none of the prior settlement agreements between Black-hawk and the VA had committee approval *1089 of reprogramming been raised as a consideration. See id. at 547-50.
As for the VA’s contention that Article 8 made payment conditional on Congress’s not acting to prevent payment, the court found the issue a close one, but sided with the VA. Crucial to this conclusion was evidence of what happened at the meeting to execute the settlement. At the meeting a VA attorney mentioned that Article 8 would limit the government’s liability should Congress affirmatively prevent the agency from paying. See id. at 543. To this statement the contractor merely shrugged and said nothing. See id. The parties then signed the agreement. See id. The court said that the contractor’s shrug “was both an acknowledgment of understanding and a dismissal of concern.” Id. at 551.
The court’s ultimate ruling gave each party a partial victory. Article 8 relieved the VA of liability on the second installment of $2.3 million, which came due after Congress enacted the legislation limiting the VA’s settlement payments; but the VA remained liable on the balance of the first installment of $8 million because it came due before the legislative enactment, when the agency had funds available with which to pay. See id. at 552-53.
For present purposes, the lesson of Blackhawk is that the court did not confine its analysis to the abstract meaning of “contingent upon the availability of appropriated funds”; it construed the language in light of the relevant statutes and (nonexistent) regulations, the policies and practices of the agency, and the communications between the parties.
Adopting this perspective, I now turn to Plaintiffs’ ISDA contracts. First, consider the statutory context. As discussed above, congressional enactments alerted tribal organizations to the likelihood of shortfalls. The appropriation for every pertinent year set an upper limit on what could be provided for contract-support costs. Whereas in Ferns the government presumably could have avoided overcommitting its limited appropriation by refusing to execute additional contracts, the Secretary had no such discretion. The ISDA requires the Secretary (1) to approve all tribal requests to execute ISDA contracts (unless certain narrow statutory grounds justify refusal), see 25 U.S.C. § 450f(a)(1), (2); and (2) to pay (subject to the availability of appropriations) the full amount of contract-support costs for each such contract, see id. § 450j-1(a)(2), (b). Because the amount of contract-support costs was thus a matter over which the Secretary had essentially no control, the only purpose for capping those costs would be to reduce them below what would otherwise be required by the ISDA.
Moreover, the Secretary gave tribal organizations repeated official notices that the restricted appropriations for contract-support costs had not been adequate and were expected to be inadequate for full funding, so that contingency plans had been made regarding how to apportion funds if they turned out to be inadequate. An annual notice in the Federal Register advised that the BIA would need to determine whether the appropriated funds for contract support would suffice to pay contract-support costs for all ISDA contracts and, if not, the BIA would pay only a pro rata portion of the costs. Every contracting organization well knew that its contract-support costs had not been paid in full for the prior year; and the notices would have had scant purpose had the BIA expected the appropriation to be adequate. Thus, unlike Ferris, the tribal organizations knew what to expect. I am not saying that giving notice can by itself relieve an agency of an obligation to pay. If the money is there, the agency must pay, as in Cherokee Nation. Rather, the point is that if legislation precludes full payment, *1090 the contractor cannot rely on Ferns if the contractor has proper notice of the problem.
In short, even though a government contractor ordinarily may not be chargeable with knowledge of the administration of the appropriation that funds the contract, it cannot close its eyes to the clear implication of statutory funding restrictions, official information publicly promulgated on the subject, and the historical course of dealing. Whether an appropriation can be viewed as a line item or a lump sum is a relevant part of the context, but only a part. Given the context here, a reasonable person construing the AFAs at issue would understand that the Secretary was promising to pay only the portion of contract-support costs that could be funded by the restricted congressional appropriation for such costs on all ISDA contracts. To be sure, ambiguities in contracts with Indian tribes should be resolved in favor of the tribes. See 25 U.S.C. § 450l(c) (Model Agreement § 1(a)(2)). But that rule does not apply here because of the clarity of the meaning of “subject to the availability of appropriations” in the present context. That language means that the government’s contract-support-cost obligation is subject to the availability of sufficient appropriations to pay for contract-support costs on all the Secretary’s ISDA contracts.
My view is supported by three opinions of two other circuits regarding the availability of contract-support costs in light of the not-to-exceed language in the appropriation acts. Two opinions predate Cherokee Nation; but I see nothing in them contrary to the Supreme Court’s analysis. And what is most important about the decisions is not so much their ultimate conclusions as their construction of the legislation, which was what I have said would be the reasonable interpretation by a tribal organization entering into an ISDA contract with the BIA.
I have already mentioned Ramah Navajo School Board, 87 F.3d 1338. In that opinion the court interpreted the ISDA’s subject-to-availability provision to mean that “each Tribe had a right only to the amount of CSF [contract-support funding] it would have received under a legal allocation plan.” Id. at 1346. It then held that the allocation plan would be legal only if it were pro rata for all tribal organizations. See id. at 1349. It found support in “[t]he legislative history of the 1995 Act[, which] indicates that Congress, aware that it had appropriated an insufficient amount for full CSF funding, intended for the agency to deal with the shortfall through a pro rata reduction.” Id. I agree that organizations contracting with the Secretary would have understood that none of them would receive full contract-support-cost funding if the restricted appropriation was insufficient to pay full costs for all of them. And, as I said earlier, the plaintiffs in Ramah Navajo School Board so understood the law. See Appellant’s Brief at 27, Ramah Navajo Sch. Bd., Inc. v. Babbitt, Nos. 95-5334, 95-5348 (D.C.Cir. Nov. 15, 1995).
In Babbitt v. Oglala Sioux Tribal Public Safety Department, 194 F.3d 1374 (Fed. Cir.1999), the court addressed, and rejected, a claim seeking the same relief as in our case — full payment of contract-support costs despite a not-to-exceed appropriation and a subject-to-availability proviso. The plaintiff raised an estoppel argument, asserting that it had detrimentally relied on § 450j-l(g)’s entitlement language. But the court said that it was unreasonable for the plaintiff to expect full payment of indirect contract-support costs because the subject-to-availability provisos in § 450j-1(b) and the model contract unequivocally informed it otherwise. See id. at 1380.
*1091 The third opinion, of course, is Arctic Slope Native Assn’n, Ltd. v. Sebelius, 629 F.3d 1296 (Fed.Cir.2010). In a thoughtful opinion by the court most conversant with federal contract law, the identical issue raised in this case was resolved in favor of the government.
In sum, I conclude that in the context of the appropriation statutes for the years in question, the ISDA, and the parties’ course of dealing, the subject-to-availability language of Plaintiffs’ ISDA contracts meant that the contract-support costs for each would need to be reduced if the appropriation for contract-support costs was inadequate to pay such costs on all ISDA contracts.
I disagree with Plaintiffs’ contention that the Cherokee Nation opinion requires otherwise. In that case the plaintiffs successfully sued for full payment of their contract-support costs for ISDA contracts with the Indian Health Service (IHS) (under the HHS Secretary) for fiscal years 1994 through 1997. See Cherokee Nation, 543 U.S. at 634, 125 S.Ct. 1172. Congress had appropriated between $1,277 billion and $1,419 billion each year for the IHS “to carry out” the ISDA. Id. at 637, 125 S.Ct. 1172 (internal quotation marks omitted). “These appropriation Acts contained no relevant statutory restrictions,” id., in contrast to appropriations to the BIA for ISDA purposes during those years, which contained caps on contract-support funding.
As Plaintiffs read Cherokee Nation, it stands for the proposition that because the appropriation for contract-support costs was more than adequate to pay those costs for any particular tribal organization, the subject-to-availability requirement was satisfied for each individual contract and the government is liable. But, as I have previously noted, Cherokee Nation does not so hold. In that case the available funds sufficed to pay the total of contract-support costs for all contracts at issue.
I must acknowledge, however, that the Cherokee Nation opinion did endorse the general proposition (which, the Court observed, the government had not contested) relied on by Plaintiffs — that “as long as Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise to pay on grounds of ‘insufficient appropriations,’ even if the contract uses language such as ‘subject to the availability of appropriations,’ and even if an agency’s total lump-sum appropriation is insufficient to pay all the contracts the agency has made.” Id. Accordingly, said the Court, the government was bound in that case unless it could “show something special about the promises ... at issue,” id. at 638, 125 S.Ct. 1172, keeping in mind the importance of “providing] a uniform interpretation of ... language [similar to ‘subject to the availability of appropriations’], lest legal uncertainty undermine contractors’ confidence that they will be paid, and in turn increase the cost to the Government of purchasing goods and services,” id. at 644, 125 S.Ct. 1172.
But what compels a different outcome here is the presence of “something special,” id. at 638, 125 S.Ct. 1172, that was not present in Cherokee Nation — namely, the context discussed at length above to show that tribal organizations must have understood that caps in the appropriation acts could (and almost certainly would) require a percentage reduction in payment of contract-support costs. Recall that the ISDA does not give the Secretary discretion to refuse to enter into an ISDA contract or to refuse to pay contract-support costs. Thus, the language of the annual appropriations acts that set a limit on the funds available for contract-support costs could have no purpose other than to re *1092 quire underpayment of contract-support costs in ISDA contracts. And because the Secretary could not beggar one tribal organization (by reducing its contract-support costs) to pay the full contract-support costs for another organization, see 25 U.S.C. § 450j — 1(b) (“[T]he Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under [the ISDA].”), Congress must have contemplated a reduction for all tribal organizations. Indeed, if we were to apply to the present context the Ferris doctrine as interpreted by Plaintiffs, the dollar limitations in the appropriations acts would be empty gestures. Because the government would still owe full contract-support costs on each ISDA contract, the caps would be irrelevant. We should refrain from interpreting statutory language in a way that renders it impotent. See Fed. Trade Comm’n v. Accusearch, Inc., 570 F.3d 1187, 1198 (10th Cir.2009) (“Under a long-standing canon of statutory interpretation, one should avoid construing a statute so as to render statutory language superfluous.” (internal quotation marks omitted)). I would adopt the more natural interpretation of the statutory scheme, which, as noted above, has been adopted in three other circuit opinions and even endorsed by the plaintiffs in one of the cases.
Moreover, Cherokee Nation does not preclude my interpretation. On the contrary, the discussion in that opinion of several arguments made by the government suggests that the Court was unwilling to endorse the rigid view of Ferris adopted by Plaintiffs here — namely, that so long as the appropriation for contract-support costs was greater than the amount of such costs in an individual ISDA contract, the subject-to-availability condition is not triggered and the government is liable. If Cherokee Nation had, as Plaintiffs contend, embraced their view of Ferris, it would have been unnecessary for the Court to address those arguments by the government; after all, the Ferris doctrine, as understood by Plaintiffs, would have guaranteed the Cherokee Nation’s victory regardless of the merits of the other arguments. It is therefore instructive to examine some of the grounds on which the Court rejected the government’s arguments against applying the general Ferris rule in that case, because the things that the Court found missing in Cherokee Nation are present here.
First, in concluding that ISDA contracts should be treated like ordinary procurement contracts, the Court wrote that it had “found no indication that Congress believed or accepted the Government’s current claim that, because of mutual self-awareness among tribal contractors, tribes, not the Government, should bear the risk that an unrestricted lump-sum appropriation would prove insufficient to pay all contractors.” Cherokee Nation, 543 U.S. at 640, 125 S.Ct. 1172 (emphasis added). Here, however, we confront restricted lump-sum appropriations that set a maximum expenditure for contract-support costs; and, perhaps more importantly, the context (as I have previously explained) unambiguously shows that Congress intended, and the tribal organizations were on notice and understood, that the restriction would reduce the contract-support costs to which each was otherwise entitled, thereby imposing on them the risk of an inadequate appropriation.
Second, the Court rejected the government’s reliance on the language in § 450j-1(b) that “the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under [the ISDA],” because no such reduction was necessary. The Court ob *1093 served that the plaintiff tribes’ claims could be paid out of unrestricted funds that had gone for government, not tribal, operations. See id. at 641-42, 125 S.Ct. 1172. In stark contrast, here the funds necessary to pay one tribal organization’s contract-support costs in full would have to come from money that would otherwise go to another contractor because of the appropriations cap on contract-support costs.
Third, the Court rejected the government’s argument that the subject-to-availability language of § 450j — 1(b) gave the Secretary “authority ... to adjust funding levels based on appropriations”; it observed that the government could point to no supporting statutory language and that the legislative history merely showed that “Executive Branch officials would have liked to exercise discretionary authority to allocate a lump-sum appropriation too small to pay for all the contracts that the Government had entered into[, but] the history does not show that Congress granted such authority.” Id. at 643-44, 125 S.Ct. 1172 (internal quotation marks omitted). True, the appropriations caps in this case likewise do not confer discretion on the Secretary. But what the Secretary sought discretion to do in Cherokee Nation is compelled here. The Secretary is forbidden to use for contract support any funds in the BIA lump-sum appropriations above the capped amounts.
Fourth, and finally, the Court said that the government could not rely on a 1999 statute setting limits on contract-support costs based on earlier committee reports. The statute said:
Notwithstanding any other provision of law the amounts appropriated to or earmarked in committee reports for the Indian Health Service for payments to tribes for contract support costs are the total amounts available for fiscal years 1994 through 1998 for such purposes.
Id. at 645, 125 S.Ct. 1172 (brackets, ellipses, emphasis, and internal quotation marks omitted). The Court said that it would be reasonable to interpret this language to forbid payment to the plaintiff tribes; but it adopted another interpretation to avoid construing the statute as having a retroactive effect. In the case before us, however, restrictions in the appropriations acts are not being applied retroactively.
To be sure, Cherokee Nation does not definitively endorse the government’s position in this case. But it certainly did not adopt Plaintiffs’ position, either. If it had, the Supreme Court could have short-circuited much of its discussion by simply saying that the government’s arguments were beside the point, because even granting all those arguments, there was certainly a sufficient appropriation to pay the contract-support costs of any single tribal organization. As just one example, it would not have had to decide whether to interpret the 1999 statute to apply retroactively, because the plaintiffs in that case would have prevailed anyway.
Accordingly, I reject Plaintiffs’ contention that language in Cherokee Nation, even if not the holding, compels judgment in their favor.
I now turn to Plaintiffs’ two remaining arguments that their ISDA contracts require full payment of their contract-support costs. One argument is that their ISDA contracts incorporate the provisions of the ISDA; and because the ISDA requires full payment of contract-support costs, each contract does so as well. I reject this argument because, as already explained at length, the ISDA does not require full payment. Full payment is conditioned on the availability of funds. See 25 U.S.C. §§ 450j(c)(1), 450j-1(b).
Plaintiffs’ other argument is that their construction of the ISDA contracts is compelled by an admission in a government *1094 brief in another case. The issue in Southern Ute Indian Tribe v. Leavitt, 497 F.Supp.2d 1245 (D.N.M.2007), was whether the IHS could be compelled to enter into a new ISDA contract with the Southern Utes even though all funds appropriated for contract-support costs for the year had already been contractually committed. In a brief filed on December 19, 2005, the government made the following statements: (1) “[T]he issue here is whether IHS is potentially liable for contract support costs once it signs on the dotted line. Given the decision in Cherokee [Nation], IHS at a minimum was reasonable in its belief that by entering a new self-determination contract with plaintiff, it might be implicitly promising to pay contract support costs in excess of Congressional appropriations,” J.App., Vol. VII at 1670 (Reply in Support of Defendants’ Motion for Summary Judgment at 6, Southern Ute, 497 F.Supp.2d 1245); (2) “According to the [Supreme] Court [in Cherokee Nation], the language [of 25 U.S.C. § 450J (c) (Model Agreement § 1(b)(4)) ] gave IHS ‘no legal right to disregard its contractual promises,’ even in the absence of available appropriations,” id. at 4; and (3) “Thus, contrary to [Southern Ute’s] claim, defendants might be held liable for plaintiffs contract support costs despite the inclusion of the [subject-to-availability] clause in their contract,” id. Plaintiffs contend that these statements amount to an admission that their interpretation of their ISDA contracts is plausible, even reasonable, and that therefore we must adopt that interpretation because of the rule that we interpret ambiguities in ISDA contracts in favor of the tribes. See 25 U.S.C. § 450( (c) (Model Agreement § 1(a)(2)).
I disagree. The contract-interpretation issue in Southern Ute was quite distinct from what confronts us. The context of the dispute was as follows: The IHS had informed the Southern Utes that there were no more funds available for contract-support costs. See Southern Ute, 497 F.Supp.2d at 1248-49. The IHS was willing to enter into a contract with the tribe for new services but only if the tribe waived its rights to contract-support costs. See id. at 1250. The tribe refused to execute a waiver. See id. The question then became whether the IHS could therefore refuse to enter into a contract with the tribe. See id. at 1252. The IHS was concerned that its executing the standard contract in that context would amount to a binding promise to pay contract-support costs despite the absence of appropriated funds to pay for those costs. See id. The quoted statements from the government’s brief were to explain why the IHS was concerned. In my view, the context of the contract-interpretation issue before us is sufficiently different that nothing in the government’s Southern Ute brief amounts to a concession of ambiguity regarding our issue.
D. Are Plaintiffs Entitled to Recovery Because of Executive’s Failure to Request Adequate Appropriation?
Plaintiffs’ final argument is that the government is liable for full payment because the executive failed to request the needed funding from Congress. They rely on S.A. Healy Co. v. United States, 576 F.2d 299 (Ct.C1.1978). The holding in Healy, however, is quite fact-specific; and the general rule stated in the opinion would not apply here. In that case, Healy and the government executed a fixed-price construction contract in November 1970, before Congress appropriated funds. See id. at 300-02. The contract contained the following subject-to-availability clause:
Under the contract to be entered into under these specifications, the liability of the United States is contingent on the necessary appropriations being made therefor by the Congress and an appro *1095 priate reservation of funds thereunder. Further, the Government shall not be liable for damages under this contract on account of delays in payments due to lack of funds.
Id. (internal quotation marks omitted). The contract was also governed by the Reclamation Project Act of 1939, which provided that “ ‘the liability of the United States [on its project contracts] shall be contingent upon appropriations being made therefor.’” Id. at 303 (quoting 43 U.S.C. § 388).
On December 22, 1970, Healy (as required by the contract) submitted a proposed schedule of forecasted earnings that set forth, among other things, $4,887,000 for fiscal year 1972. See id. at 301. The contracting officer approved this schedule in February 1971 and Healy promptly began construction. See id. Meanwhile, in late January 1971 the President sent his proposed budget to Congress; but he requested only $1,800,000 for Healy’s contract for fiscal year 1972. See id. at 302. Not until July 1971 did the contracting officer notify Healy how much had been requested. See id. Healy protested that the requested amount was “ ‘totally inadequate’ ” and, on inquiring about the possibility of a supplemental appropriation, was told that prospects were bleak. Id. Nevertheless, Healy decided to proceed to the extent possible and continued with construction until September 22, 1971, when funds were exhausted. See id. Three months later, Congress approved a supplemental appropriation request that provided enough money to cover Healy’s earnings for fiscal year 1972. See id. In January 1972 the government notified Healy that more money was available, and construction resumed. See id.
Despite the contractual and statutory subject-to-availability provisions, the court awarded damages to Healy. See id. It reasoned that the contract did not unambiguously state that the contractor had to bear “the full risk of a funds shortage” when the shortage was the agency’s fault; and it found that the government agency was at fault for not requesting a sufficient appropriation to pay the contractor. Id. at 304; see id. at 305. Consequently, the contractor was entitled to damages caused by the work stoppage between when appropriated funds were exhausted and when a supplemental appropriation bill was enacted. See id. at 302, 307-08.
The court described its holding as a narrow one. It said that it was not suggesting that the “executive branch was contractually obligated to request from [Congress] appropriations adequate to fund continued performance.” Id. at 307. Rather, it held
only that (a) a contract will not be construed to throw all the cost and loss necessarily incident to such a decision on the contractor, and none of it on the party whose decision caused the loss, unless clauses of the contract require that result without ambiguity, and (b) ... a government agency that claims a right to do this is under an implied obligation to assist its contractor, by timely and candid information to take the measures that the latter may deem best to diminish and mitigate its loss.

Id.

The situation presented on this appeal is quite distinguishable from the egregious conduct in Healy. Healy was not informed that it might be underpaid until well after the contract was executed and performance had begun. Indeed, the contracting officer approved the contractor’s budget even though the President had already requested less than 40% of that sum from Congress, and the officer did not notify the contractor of that request for another five months. Here, in contrast, Plaintiffs do not dispute the government’s *1096 contention that “the tribes have participated in annual budget consultations with BIA.” Aplee. Br. at 48 n.16; see 25 U.S.C. § 450j-1 (i) (requiring the Secretary to solicit tribes’ participation in formulating the BIA’s budget requests). And, as I have already explained, the statutory context and the historical course of dealing made it clear to tribal organizations that annual shortfalls were likely and that contract-support costs would be underpaid.
III. CONCLUSION
For the foregoing reasons, I respectfully dissent.

. I should note, however, that for fiscal year 1999, Congress prohibited new or expanded ISDA contracts. See Pub.L. No. 105-277, § 328, 112 Stat. 2681, 291-92.

. See, e.g., 59 Fed.Reg. at 55318 (fiscal year 1995); 63 Fed.Reg. at 5399 (fiscal year 1998); 66 Fed.Reg. at 15276 (fiscal year 2001). But see 58 Fed.Reg. at 68694 (notice for fiscal year 1994, stating that the final distribution of contract-support funds will be made "around May 1”).

. It is worth noting that even if there had been no statutory cap on contract-support costs, full payment would likely not have been made until well after performance of the contract had begun. The contract-support costs were typically expressed as a percentage of an agreed-on base amount rather than in dollar terms. The percentage — called the indirect-cost rate — was negotiated with the Inspector General of the Department of the Interior. See 25 U.S.C. § 450b(g) (" 'indirect cost rate' means the rate arrived at through negotiation between an Indian tribe or tribal organization and the appropriate Federal agency”); S.Rep. No. 100-274, as reprinted in 1988 U.S.C.C.A.N. at 2628 ("Tribal indirect cost rates are negotiated and approved according to OMB guidelines by the Department of Interior Office of Inspector General.”). The product of that rate and the base amount is intended to be the best approximation of what the indirect contract-support costs are. See 2 C.F.R. pt. 225 (OMB Guidelines). The negotiation to establish the indirect-cost rate was ordinarily conducted after execution of the AFA. Ramah's controller explained:
Our indirect cost rates are usually not determined by agreement until well after the commencement of the federal fiscal year and sometimes not until after it is concluded. The principal reason is that indirect cost proposals must be accompanied by single agency audits for the year ending two years prior to the fiscal year for which the application is being made. However, in practice it has proven impossible for us to finalize our audits prior to the commencement of the federal fiscal year in question.
J. App., Vol. II at 266-67.

. The preceding paragraph, which is entitled "Negotiated Indirect Cost Rales," describes how ihe parties are to arrive at a rate:
1. The allowable indirect costs under this contract shall be obtained by applying negotiated indirect cost rates to bases agreed upon by the parties, as specified below.
2. Negotiation of indirect cost rates by the Contractor and the cognizant audit agency shall be undertaken as promptly as practicable after receipt of the Contractor's indirect cost proposal.
3. Allowability of cost and acceptability of cost allocation methods shall be determined in accordance with OMB Circular A-87.
4. The results of each negotiation shall be set forth in an Indirect Cost Negotiation Agreement, such agreement shall become a part of this contract by reference. The agreement shall specify:
(a) The agreed indirect cost rate(s);
(b) The base to which to the rate(s) apply;
(c) The periods for which the rate(s) apply; and,
(d) The specific items treated as exclusions or any changes in the items previously agreed to be treated as exclusions.
5. The Contractor is to be reimbursed for all allocable and allowable indirect costs incurred in performance of this contract, subject to any statutory limitations applicable.
6. Any failure by the parties to agree on any indirect cost rate(s) or applicability of the rate(s) to the bases under this provision shall be considered a dispute concerning a question of fact for decision by the Awarding Official within the meaning of the clause of the contract entitled "Disputes".
J. App., Vol. IV at 919-20. The indirect-cost rate is not an issue in this appeal.

. It is also worth noting that the contracts give tribal organizations the right to suspend performance if they become insecure about payment:
The Contractor shall not be obligated to continue performance that requires an expenditure of funds in excess of the amount of funds awarded under this Contract. If, at any time, the Contractor has reason to believe that the total amount required for performance of this Contract or a specific activity conducted under this Contract would be greater than the amount of funds awarded under this Contract, the Contractor shall provide reasonable notice to the appropriate Secretary. If the appropriate Secretary does not take such action as may be necessary to increase the amount of funds awarded under this Contract, the Contractor may suspend performance of the Contract until such time as additional funds are awarded.
25 U.S.C. § 4501 (c) (Model Agreement § 1(b)(5)).

. In addition, Plaintiffs rely on § 450j — 1 (d)(2), which states: “Nothing in this subsection shall be construed to authorize the Secretary to fund less than the full amount of need for indirect costs associated with a self-determination contract.” But this provision explicitly applies only to subsection (d) of § 450j-l. See id. § 450j — 1(d)(1) ("Where a tribal organization's allowable indirect cost recoveries are below the level of indirect costs that the tribal organizations should have received for any given year pursuant to its approved indirect cost rate, and such shortfall is the result of lack of full indirect cost funding by any Federal, State, or other agency, such shortfall in recoveries shall not form the basis for any theoretical over-recovery or other adverse adjustment to any future years’ indirect cost rate or amount for such tribal organization, nor shall any agency seek to collect such shortfall from the tribal organization.”). The provision does hot purport to have any effect on the subject-to-availability language of § 450j-1(b). Thus, I fail to see any relevance of § 450j — 1(d)(2) to the present dispute.